[No. H034432. Sixth Dist. June 15, 2010.]

ZORAN CORPORATION, Plaintiff and Appellant, v.
THOMAS CHEN, Defendant and Respondent.

800

COUNSEL

O'Melveny & Myers, Meredith N. Landy, Roberta H. Vespremi and Vivi N. Tran for Plaintiff and Appellant.

John R. Parsons and Heather Ledgerwood for Defendant and Respondent.

## OPINION

**ELIA, J.**—In this action for breach of contract, misrepresentation, and related causes of action against respondent Thomas Chen and seven corporations, the superior court granted summary judgment to Chen. Zoran Corporation contends that Chen was the alter ego of the corporate defendants and was therefore liable for the outstanding debts those defendants owed for their purchases of parts from Zoran. Zoran further contends that Chen personally guaranteed payment of those debts. We find triable issues of fact and therefore must reverse the judgment.

### Background

Plaintiff Zoran is in the business of developing digital technologies and applications for home and office. Zoran sells various equipment components to manufacturers, which incorporate the components into their products. Among those that obtained Zoran products in 2004 and 2005 were Kent World Co., Ltd. (Kent World); Protop Innotech Inc.; Cyberhome Electronics, Inc. (Cyberhome); Argus Electronics, Inc., in Taiwan (Argus Taiwan); Argus Electronics, Inc., in the United States (Argus USA), a wholly owned subsidiary of Argus Taiwan; Citron Electronic Company (Citron); and Iwin International Corp. (Iwin), an affiliate of Cyberhome. Citron had been formed for the purpose of investing in the Chinese factory Han Hua Optics, which manufactured DVD players. Argus USA performed customer support for Cyberhome and some product development and testing. Kent World, Cyberhome, and Protop Innotech merged in 2005; their replacement entity was Protop Technology Co. (Protop Technology or Protop).

According to Zoran's second amended complaint, three companies—Kent World, Iwin, and Citron—submitted purchase orders to Zoran during the 2004–2005 period. Iwin was a "paper entity," which bought three million parts from Zoran toward the end of 2004 and sold the parts to Citron. The Zoran products ordered by all three companies were shipped directly to Citron. Citron assembled the components at its Han Hua factory and sold the finished goods to Protop, which then sold the products to Cyberhome. Cyberhome marketed those products in the United States. Protop's product development engineers were housed at the Han Hua factory.

Chen was one of three or four directors of Cyberhome in 2001 and 2002 and one of five directors of Kent World until the merger. He was one of the directors of Argus Taiwan from 2000 to 2003 and its chairperson until 2003. He was chairman of Protop Innotech and of Protop Technology after the merger. According to his declaration, Chen did not own stock in any of the defendants except Protop and Argus Taiwan. His wife and younger sister,

however, owned minority shares in Cyberhome and Argus Taiwan; that sister owned a minority share in Kent World as well. Chen's older brother also owned a minority share in Argus Taiwan, as did his older sister and her husband.

Through May of 2005, Zoran extended more than $40 million of credit to Kent World, Citron, and Iwin. In September 2004 Citron promised to be responsible for the debt of Kent World, which it represented to be its subsidiary. In December 2004 Cyberhome represented Iwin to be its affiliate and guaranteed payment of Iwin's obligations to Zoran. In February 2005 Cyberhome similarly guaranteed payment to Zoran for chipsets Citron would purchase from Zoran. On March 9, 2005, Chen wrote to Zoran to guarantee payment of Citron's balance in the amount of $1.3 million. Citron apparently paid that debt without the necessity of Chen's further involvement.

In January 2006, Zoran and Cyberhome entered into a "Consolidation Agreement" combining the prior financing obligations of the debtor companies. Although all were denoted as co-obligors in the agreement, only Tin Wu, president of Cyberhome, signed the document as a co-obligor.

According to Zoran, $8,841,151.10 remained unpaid. Zoran filed suit in May 2006, naming only Chen and Argus Taiwan as defendants. The second amended complaint, filed in August 2006, named Chen, Argus Taiwan, Argus USA, Cyberhome, Iwin, Citron, and Kent World. The complaint was later amended to substitute Protop Technology for one of the Doe defendants. Zoran pleaded causes of action for breach of contract, breach of the covenant of good faith and fair dealing, negligent and intentional misrepresentation, quantum meruit, unjust enrichment, promissory estoppel, and common counts for money due. The sixth cause of action was directed only at Chen; it alleged breach of his oral personal guaranties of payment on behalf of the "Argus Group Companies."[1]

A central theory of the complaint was that Chen represented that he directly controlled and dominated the defendant companies, and that for each of them there was "a unity of interest and ownership" such that any "individuality and separateness" between Chen and the company had ceased and the company was the alter ego of Chen. With reference to each, Zoran

---

[1] Chen makes much of Zoran's references to the "Argus Group Companies," which Zoran used throughout the complaint to refer collectively to defendants. It is true that Zoran admitted that no one had ever used that term to describe defendants or their relationship; thus, Zoran inaccurately stated in its complaint that "Chen sought to establish a business relationship with Zoran for what he represented was his 'Argus Group Companies.' " Chen's point, while correct, is immaterial. Wherever one of the defendants is the subject of an allegation, the complaint makes that clear by naming the entity.

alleged that adherence to the fiction of the entity as distinct from Chen "would permit an abuse of the corporate privilege and would sanction fraud in the form of Chen's misrepresentations made on behalf of himself and [the entity], which fraud resulted in substantial damage to Zoran."

Only Chen remains in the action. Cyberhome declared bankruptcy in September 2006, and the bankruptcy trustee eventually paid Zoran $139,925.03 in the case against it. In December 2006 the court entered defaults against Iwin and Citron, and it entered Protop's default on September 15, 2008, after striking Protop's untimely answer. Argus Taiwan and Argus USA were ordered to pay terminating sanctions for discovery abuses, and their defaults were entered in April 2009.

Chen moved for summary judgment or alternatively, summary adjudication. He maintained that he was not liable under any of the causes of action because he had made only one written contractual promise, which he performed; he did not make any misrepresentations or enforceable promises on which Zoran relied; and he did not order or receive any goods from Zoran. Chen further asserted that he was not the alter ego of Kent World, Citron, Iwin, Cyberhome, Argus Taiwan, or Argus USA. Finally, Chen claimed an affirmative defense to the allegation of breach of oral guaranty based on the Consolidation Agreement, which Chen had not signed and which modified all of the obligations underlying the alleged guaranty.

The trial court considered the moving and opposing papers and both parties' evidentiary objections. The court determined that Chen had met his initial burden to show that he was not an alter ego of any of the defendant entities, that he had not received goods or services from Zoran, and that he had negated at least one element of the causes of action for misrepresentation and promissory estoppel. Further, the court ruled, because Zoran had not met its burden of raising a triable issue of fact on any of the causes of action, Chen was entitled to summary judgment. From the ensuing judgment on June 29, 2009, Zoran brought this timely appeal.

*Discussion*

1. *Scope and Standard of Review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

A defendant who moves for summary judgment or summary adjudication bears the initial burden to show that the action or cause of action has no merit—that is, "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subds. (a), (p)(2).) When the burden of proof at trial will be on the plaintiff by a preponderance of the evidence, the moving defendant "must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence' " to support a necessary element of the cause of action. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30], quoting *Aguilar, supra,* 25 Cal.4th at p. 854; see *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

If the defendant fails to meet this initial burden, it is unnecessary to examine the plaintiff's opposing evidence; the motion must be denied. (*Quintilliani v. Mannerino* (1998) 62 Cal.App.4th 54, 59–60 [72 Cal.Rptr.2d 359].) However, if the defendant makes a prima facie showing that justifies a judgment in its favor, the burden then shifts to the plaintiff to make a prima facie showing that there exists a triable issue of material fact. (*Aguilar, supra,* 25 Cal.4th at p. 850.) "The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).)

On appeal, we conduct a de novo review of the record to "determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 334; see *Daly v. Yessne* (2005) 131 Cal.App.4th 52, 58 [31 Cal.Rptr.3d 420].) We apply the same procedure used by the trial court: We examine the

pleadings to ascertain the elements of the plaintiff's claim; the moving papers to determine whether the defendant has established facts justifying judgment in its favor; and, if the defendant did meet this burden, plaintiff's opposition to decide whether he or she has demonstrated the existence of a triable issue of material fact. (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 84–85 [20 Cal.Rptr.3d 1]; *Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 887 [41 Cal.Rptr.2d 740].)

We recognize that summary judgment " 'is a drastic measure which should be used with caution so that it does not become a substitute for trial.' " (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 610 [7 Cal.Rptr.2d 859]; see *Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159 [49 Cal.Rptr.3d 153].) Consequently, "[i]n performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "We need not defer to the trial court and are not bound by the reasons for the summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Knapp v. Doherty, supra*, 123 Cal.App.4th 76, 85.)

## 2. Allegations of the Complaint

Because summary judgment review is defined by the issues raised in the pleadings, we first direct our attention to the material allegations of Zoran's second amended complaint. Zoran alleged that Chen had initiated the business relationship between Zoran and each of the companies he controlled. When Chen asked Zoran to do business with Iwin, Zoran was concerned because each of the other companies had overdue balances on their accounts. But Chen allegedly assured Zoran that he controlled Argus Taiwan, which controlled Iwin, and he would "make certain that all such payments were made." Subsequently Cyberhome, which Zoran alleged to be one of the "Argus Group Companies," guaranteed Iwin's payment as Cyberhome's affiliate. When the debt of Iwin and Citron (where the parts were shipped) became $7.8 million, Zoran sought additional assurances from Cyberhome, which guaranteed payment of Citron's obligations in February 2005. Chen, however, had already instructed some of the companies to wire payments to a Taiwan account he controlled. He continued to direct them to do so thereafter, and at least one did. Chen, however, "refused" to forward the payments to Zoran.

The complaint attached the March 9, 2005 letter from Chen to Zoran guaranteeing payment of Citron's balance in a total amount of $1.3 million. Zoran alleged that this letter, along with Chen's oral representations, induced Zoran to continue to extend credit to the defendant companies. A substantial balance continued to accrue, however, and in June 2005 Chen orally promised that he would "personally take care of the matter and make certain that the entire amount owed by the Argus Group Companies to Zoran was paid."

On September 2, 2005, Tin Wu, president of Cyberhome, sent Zoran an e-mail setting forth the payment schedule accounting for $10 million in payments between September 21 and November 30, 2005. On December 30, 2005, and again in January 2006, Chen "acknowledged the entire outstanding balance owed to Zoran and promised Zoran that he could and would make certain that it was paid in full." However, Chen "never intended to fulfill those promises and representations." On January 20, 2006, Chen discussed consolidating the debt. On behalf of himself and the defendant companies, Chen agreed to the terms of the Consolidation Agreement, which made Chen and all of the companies "jointly and severally liable for the entire debt owed to Zoran." By this time the companies' debt to Zoran was at least $9,395,601.60. Chen represented that he would sign the document, but he failed to fulfill that promise or procure the signatures of any other company representative except Tin Wu of Cyberhome. Zoran received only two payments after the date of the Consolidation Agreement—one on January 27 for $700,000 and one on March 10 for $800,000. The complaint alleged a total amount due of at least $8,841,151.10.

The causes of action for breach of contract and breach of the covenant of good faith and fair dealing are based on Citron's guaranty of the Kent World debt, the Cyberhome guaranty of the Citron and Iwin debts, and the debt incurred by Cyberhome in the Consolidation Agreement. The specific allegation against Chen is that he breached the "Chen Guarantee Re Citron" by not paying all amounts owed by Citron, including the amounts incurred by Kent World.

The misrepresentation and promissory estoppel causes of action were based on the assurances of all the defendants, and specifically Chen, that the debts would be paid, which "lulled" Zoran into a false sense of security and induced it to continue doing business with the companies and to forbear taking action to collect the amounts due. These representations were also included in the quantum meruit claim, to supplement the allegation that the defendant companies had benefited from the goods for which they had not paid. As neither Chen nor the companies paid for the goods, defendants were unjustly enriched and were liable on open book accounts.

Finally, the cause of action for breach of oral guaranty alleged against Chen alone was based on the alleged "series of oral personal guaranties," the promise to enter into the Consolidation Agreement, and a promise to "personally guarant[ee] the amount due under the Consolidation Agreement." Thus, Chen, as well as the defendant companies, was alleged to be obligated to pay the full $8,841,151.10 claimed as consequential damages.

### 3. *Chen's Showing*

Chen's summary judgment motion was premised on the lack of admissible evidence of (1) any contract beyond the March 9, 2005 guaranty of an obligation that had been satisfied in full; (2) any representation that he would personally pay the debts of the others; (3) any reliance by Zoran on any statement or promise Chen had allegedly made; or (4) Chen's receipt of any goods or other enrichment by Zoran. Chen further asserted that the Consolidation Agreement superseded the prior financing arrangements and thus discharged any oral promises Chen might have made regarding the prior debts. Addressing Zoran's "alter ego" claim, Chen argued that Zoran was unable to rebut the presumption that each corporate defendant was a separate entity.

Taking this approach required Chen to support his motion with evidence that Zoran did not possess, and could not reasonably obtain, the necessary evidence to show that Chen had personally promised to be responsible for paying the defendant entities' debts or that he was liable as their alter ego. It was not enough simply to assert that Zoran had no evidence supporting an element of each cause of action; a moving defendant "*must* indeed present[] 'evidence,' " such as " 'affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice' must or may 'be taken.' " (*Aguilar, supra,* 25 Cal.4th at p. 855.)

Chen produced his March 9, 2005 letter guaranteeing payment of Citron's $1.3 million debt to Zoran. Zoran admitted in discovery that this obligation had been paid in full, and that Chen had not signed the Consolidation Agreement or any other written promise to pay the defendant companies' debts to Zoran. In his supporting declaration Chen stated that he had never orally agreed to guarantee payment of those obligations.

This evidence did show that Chen was not *directly* liable for breach of contract, breach of the covenant of good faith and fair dealing, or breach of an oral guaranty. But the gravamen of the two contract claims was that Kent World, Iwin, Citron, and Cyberhome had breached their obligations to Zoran and that each defendant company was the alter ego of Chen. The only causes of action identifying specific acts by Chen were breach of an oral guaranty

and the two misrepresentation claims. As noted above, Chen presented affirmative evidence that he had made no written or oral promises to be responsible for the defendant companies' obligations, with the sole exception of the March 9, 2005 guaranty. On appeal Chen also points to the deposition testimony of Karl Schneider, Zoran's chief financial officer (CFO), who admitted that he had not documented Chen's repeated oral assurances that he would "see that Zoran [was] paid." Chen adds that such assurances were "nothing more than his opinions about the future conduct of third parties." Schneider did not describe a prediction, however, but reported "at least 10 to 12" telephone conversations in which Chen had assured him "that he would see that . . . the Zoran debts got paid."

Chen also states that Zoran never *alleged* that Chen would pay Zoran if one of the defendant companies failed to meet its obligation. The cause of action for breach of oral guaranty, however, clearly makes that allegation. Chen's further point that Zoran "never proved that Chen orally said he would pay Zoran if one of the purchasers did not pay" is irrelevant, since Zoran was not obligated to prove anything at this stage of the litigation.

Nevertheless, Chen's evidence does demonstrate that Chen did not expressly promise to be *personally* liable for the defendant companies' obligations to Zoran. In its opposition Zoran did not state otherwise; instead, it maintained that "Chen's oral assurances that he would make certain Zoran was paid if the entities failed to pay [made] Chen the principal debtor and the companies his sureties." Schneider's deposition testimony supports that assertion; he stated that Chen told him during the 10 to 12 phone conversations that he would *see* that the *other defendants* paid Zoran for their past purchases. The most direct expression of responsibility occurred on August 4, 2005, when Chen told Levy Gertzberg, Zoran's chief executive officer (CEO), " 'Leave it to me, I will take care of it. I am responsible for this, I will take care of it, don't have to worry, trust me, I will take care of it.' "

 As Chen notes in part, a surety obligation must be accompanied by separate consideration unless contemporaneous with the original obligation, and it must be in writing, subject to the exceptions for original obligations listed in Civil Code section 2794.[2] (Civ. Code, §§ 1624, 2792–2794.) Zoran

---

[2] Civil Code section 2794 lists six circumstances under which the obligation of the promisor will be deemed an original obligation and thus will require no writing: "(1) Where the promise is made by one who has received property of another upon an undertaking to apply it pursuant to such promise; or by one who has received a discharge from an obligation in whole or in part, in consideration of such promise; [¶] (2) Where the creditor parts with value, or enters into an obligation, in consideration of the obligation in respect to which the promise is made, in terms or under circumstances such as to render the party making the promise the principal debtor and the person in whose behalf it is made, his surety; [¶] (3) Where the promise, being for an antecedent obligation of another, is made upon the consideration that the party receiving

replies that no writing was necessary to make his oral guaranties enforceable, because they were made "contemporaneously with each order [Chen] placed with Zoran through one of his entities." Invoking subdivision (4) of Civil Code section 2794, Zoran contends that "Chen gained a business advantage" from each of these transactions, through "earning income for his entities, and therefore himself."

The limited record before us indicates, however, that in the conversations reported by Gertzberg and Schneider, the parties were discussing *past* debts of the companies, not future orders. It does not appear that Zoran relied on the cited assurances to enter into any *new* transactions with the defendant companies. To the point that Chen was liable for *existing* debts from their inception, the success of Zoran's position depends on the viability of its alter ego theory. We therefore turn to that issue.

### 4. *Alter Ego Liability*

Zoran's alter ego theory is the primary basis on which Zoran premises Chen's liability, not only in its pleadings but in its opposition papers below and its argument on appeal. Rather than contest Chen's initial showing, Zoran argues that it met its subsequent burden to raise a triable issue of fact based on Chen's domination and control of at least Cyberhome, Iwin, and Citron.[3]

"Alter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person." (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285 [31 Cal.Rptr.2d 433].) "The essence of the alter ego doctrine is that justice be done. . . . Thus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301 [216 Cal.Rptr. 443, 702 P.2d 601].)

---

it cancels the antecedent obligation, accepting the new promise as a substitute therefor; or upon the consideration that the party receiving it releases the property of another from a levy, or his person from imprisonment under an execution on a judgment obtained upon the antecedent obligation; [¶] (4) Where the promise is upon a consideration beneficial to the promisor, whether moving from either party to the antecedent obligation, or from another person; [¶] (5) Where a factor undertakes, for a commission, to sell merchandise and act as surety in connection with the sale; [¶] (6) Where the holder of an instrument for the payment of money, upon which a third person is or may become liable to him, transfers it in payment of a precedent debt of his own, or for a new consideration, and in connection with such transfer enters into a promise respecting such instrument."

[3] Zoran focuses on these companies because "Citron and Iwin ordered goods from Zoran" and Cyberhome was "the company that indisputably guaranteed the debt and entered into a separate omnibus contract in which it assumed responsibility for the debt, and of Iwin and Citron, the companies through which Chen placed the orders with outstanding balances."

Whether a party is liable under an alter ego theory is normally a question of fact. (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1248 [1 Cal.Rptr.2d 301]; accord, *RLH Industries, Inc. v. SBC Communications, Inc.* (2005) 133 Cal.App.4th 1277, 1288 [35 Cal.Rptr.3d 469].) "The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court." (*Stark v. Coker* (1942) 20 Cal.2d 839, 846 [129 P.2d 390].) Nevertheless, it is generally stated that in order to prevail on an alter ego theory, the plaintiff must show that "(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected." (*Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at p. 1285.)

"The alter ego test encompasses a host of factors: '[1] [c]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses . . . ; [2] the treatment by an individual of the assets of the corporation as his own . . . ; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same . . . ; [4] the holding out by an individual that he is personally liable for the debts of the corporation . . . ; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . . ; [5] the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family . . . ; [6] the use of the same office or business location; the employment of the same employees and/or attorney . . . ; [7] the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . . ; [8] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . . ; [9] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities . . . ; [10] the disregard of legal formalities and the failure to maintain arm's length relationships among

related entities . . . ; [11] the use of the corporate entity to procure labor, services or merchandise for another person or entity . . . ; [12] the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another . . . ; [13] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions . . . ; [14] and the formation and use of a corporation to transfer to it the existing liability of another person or entity.' . . . [¶] This long list of factors is not exhaustive. The enumerated factors may be considered '[a]mong' others 'under the particular circumstances of each case.' " (*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223, 249–250 [81 Cal.Rptr.2d 425], citation omitted, quoting *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838–840 [26 Cal.Rptr. 806]; see also *VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.* (2002) 99 Cal.App.4th 228, 245 [121 Cal.Rptr.2d 1].) "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine. [Citation.]" (*VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc., supra,* 99 Cal.App.4th at p. 245.)

In this case the trial court first determined that Chen had introduced admissible evidence showing that he was not the alter ego of any of the defendant companies. Zoran's opposition, on the other hand, had not raised a reasonable inference to the contrary. In the court's view, Zoran's evidence showed that Chen "influenced and controlled some of the entity defendants in the manner a chairman would typically influence and control a closely knit group of corporations. However, it does not show that Chen controlled the entity defendants in such a way as to commit fraud or other misdeeds against Zoran. Nor does it show that Chen influenced and controlled the entity defendants to the extent that the separate personalities of Chen and the entity defendants did not exist. Nor does it show that Zoran's contracts with Kent World, Citron, Iwin and Cyberhome were in reality contracts with Chen, the individual." The court concluded that while the evidence permitted the inference that some of the corporations were alter egos of each other, it did not raise a reasonable inference that they were alter egos of Chen.

Having reviewed the evidence supplied in Zoran's opposition, including the exhibit excluded by the trial court,[4] we agree with Zoran that an issue of fact existed on the question of whether Chen dominated and controlled Citron

---

[4] The court excluded exhibit H, a transcript of deposition testimony by Chen's brother, Jeffrey Chen. The witness stated that he had never been the CEO of Citron and had never seen the credit application that listed him as CEO. It is unnecessary to reach the propriety of the court's evidentiary ruling, which Zoran contends was an abuse of discretion.

and Iwin, if not also Cyberhome. Zoran supplied evidence that Chen provided the startup funding for Cyberhome; bonuses, salary increases, and settlement of litigation were "passed on" by Chen; and Chen's sister, wife, and possibly brother-in-law had been shareholders. In the summer of 2006 Amy Sun, Chen's wife, loaned money to Cyberhome, though she could not remember how much; and bankruptcy documents reflected that she and Chen's sister each held four million shares of the company. Tin Wu, as president of Cyberhome, reported to Chen, as he had at Argus USA. Imelda Farrell, a former employee at Cyberhome, testified that Chen had control over the day-to-day activity of Cyberhome, kept an office there, ensured a low cash balance, and instructed Tin Wu what to do. Part of the money coming into Cyberhome was used to pay off its debt, but there was barely enough in its accounts to cover rent and payroll; the rest was sent to Protop, Chen's company in Taiwan. According to Farrell, "there was no movement in the company [in which] Thomas Chen was not involved."

Wu, who had been president of Argus USA before joining Cyberhome, believed that Chen had owned Protop and Argus Taiwan and had "set up" Argus USA as a subsidiary of Argus Taiwan. On one or two occasions after the Consolidation Agreement was signed, Cyberhome collected money to pay Zoran. Chen requested that Wu wire the money to Protop (from which Cyberhome purchased the finished goods), and Protop would pay Zoran; but the money Wu sent was not thereafter forwarded to Zoran. When Wu asked for an explanation, Chen did not respond.[5]

On the other hand, Cyberhome contracts were "as a rule" negotiated and executed without Chen's approval. Zoran's evidence did not show that Chen had agreed to be personally liable for Cyberhome's debt under the Consolidation Agreement. Wu testified that Chen did not indicate his position either way in their discussions about the agreement; on the other hand, he did give Wu "authority to continue negotiating on his behalf for the [C]onsolidation [A]greement." Karl Schneider, Zoran's CFO, stated that Chen only agreed "in principle" to consolidating the other entities' debts to Zoran; he thought "putting it on Cyberhome's shoulders" was "a good idea," but he did not undertake to be personally responsible for that debt.

---

[5] At his deposition Chen first acknowledged that "ProTop should pay Citron's account payable because . . . Citron sent goods to ProTop, and then ProTop will then sell them on to CyberHome USA." Chen said that he had made the personal guaranty because he "knew that ProTop would pay Citron and that ProTop should pay Citron . . . ." When he was then asked why Protop had not paid the more than $8 million that he claimed Citron owed Zoran, he answered simply, "Because ProTop never bought anything from Zoran." There may have been further clarification of this statement, but that testimony is not in the record.

Taken together, the facts proffered by Zoran, if proved, could establish that Chen had considerable influence, and even domination and control, over Wu's management of Cyberhome and that Chen used that influence to induce Wu to send money to Protop instead of directly to Zoran as creditor. It is not for the reviewing court to decide whether Chen's influence on—or indeed, control over—Cyberhome through Wu compels the further inference that Chen and Cyberhome had such a unity of interest that " 'the separate personalities of the corporation and the individual no longer exist[ed] . . .' " (*Mesler v. Bragg Management Co., supra*, 39 Cal.3d at p. 300.) Zoran has raised a triable issue as to Cyberhome's identity as Chen's alter ego or vice versa.[6]

Zoran's evidence regarding Citron supports the inference that Chen had influence over that company as well. Chen himself testified that Citron was set up for the purpose of investing in Han Hua Optics.[7] Wu testified that Chen ran Citron. Jeffrey Chen, Chen's brother, had never seen the credit application that listed him as CEO of the company; he did not know what "CEO" meant, and when it was explained to him, he said he had never been Citron's CEO. In Chen's response to interrogatories he listed Jeffrey Chen as a director of Citron. In his March 9, 2005 letter Chen guaranteed the payment of $1.3 million from several invoices Zoran had issued to Citron. Chen estimated that he discussed the overdue Citron account with Karl Schneider between three and five times, and once or twice with Levy Gertzberg. It was Wu, however, writing on behalf of Cyberhome in February 2005, who guaranteed payment of part of Citron's obligation.

Iwin, according to Chen, was only a "paper entity"; the parts it bought from Zoran were sent directly to Citron. In Chen's declaration he stated that he had no connection with Iwin, whether in its formation or in its management. He was not a stockholder, director, or employee of Iwin; he only "mentioned" Iwin to Wu, who made the decision to order parts from Zoran through Iwin. Wu, on the other hand, testified that Chen was "the final decision-maker" concerning whether Iwin would purchase from Zoran. Chen admitted that he had "discussed" the price of the three million parts Iwin ordered from Zoran toward the end of 2004. However, in December 2004 Wu represented Iwin to be Cyberhome's affiliate and thus guaranteed Iwin's payment of $7.8 million, the amount then owed to Zoran.

---

[6] Zoran characterizes the relationship both ways, that Chen was the alter ego of Cyberhome and that Cyberhome was the alter ego of Chen.

[7] Chen testified that he was involved in "setting up" the Han Hua factory, and that he "functioned" as head of the product development center there. Those employees in the eight departments that reported to him referred to him as "Director Chen."

The evidence Zoran points to on appeal does not uniformly support its position, partly because much of the deposition testimony in the record contains incomplete references to events or sources of information. Nevertheless, Zoran has presented a triable issue on the question of whether Chen made all the decisions for the defendant companies. Based on conversations he had had with Chen as well as others, Schneider came to the understanding that Chen was the person who would deal with Zoran on behalf of all the defendant companies. Wu told Schneider that Chen "called all the shots," that Ricky Huang (CFO of Citron) "worked for . . . a company that [Chen] controlled." Chen also made representations to Gertzberg that he controlled "everything," that he "ma[d]e the decisions, eventually it's me," thus contributing to the inference of control.

■ Taken together, Zoran's evidence reveals a businessman with heavy influence on the decisions made by executives of several companies. Chen promised to use his influence to see that Zoran was paid the overdue amounts from the defendant companies, although he did not promise to be directly responsible for those obligations. The evidence further suggests that Chen permitted the diversion of money destined from Cyberhome to Zoran by persuading Wu to send payments to Protop instead of directly to Zoran. While we cannot draw the further inference *as a matter of law* that there was such a unity of interest between Chen and Citron, Cyberhome, or Iwin that each of these companies must be deemed the alter ego of Chen, neither can we say on this record that Zoran will be unable to make the requisite showing at trial.

Should Zoran succeed in showing such unity of interest and ownership, it will then be obligated to demonstrate that "an injustice would result from the recognition of separate corporate identities . . . ." (*VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc., supra,* 99 Cal.App.4th at p. 245; see also *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 [99 Cal.Rptr.2d 824] [plaintiff must show it would be inequitable to treat alleged acts as those of corporation alone].) This question is for the superior court, not this court, in the first instance. (*Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at p. 837.)

*Disposition*

The judgment is reversed. Costs on appeal are awarded to Zoran.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied July 9, 2010, and respondent's petition for review by the Supreme Court was denied September 1, 2010, S184725.