Filed 12/10/14   Mechtect Motorsports v. All Mechtech CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MECHTECH MOTORSPORTS, INC. et al., | D063426 |
| Cross-complainants, Cross-defendants, and Respondents, | |
| v. | (Super. Ct. No. 37-2011-00055785-CU-BC-NC) |
| ALL MECHTECH, LLC et al., | |
| Cross-defendants, Cross-complainants, and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Affirmed.

Boudreau Williams and Jon R. Willams; Stratton & Green and Cynthia Lee Stratton for Cross-defendants, Cross-complainants and Appellants.

Kenneth N. Greenfield, Alexandra N. Selfridge for Cross-complainants, Cross-defendants and Respondents.

A jury returned a verdict holding William Dunivan individually liable for breaching a contract he had assigned to his wholly owned limited liability company

before the alleged breach occurred. The trial court then found Dunivan individually liable for the same breach based on the alter ego doctrine. Dunivan and his limited liability company contend the trial court erred by (1) allowing the jury to consider Dunivan's individual liability, and (2) applying the wrong criteria to find Dunivan liable on an alter ego basis.[1] We conclude the trial court applied the correct criteria to invoke the alter ego doctrine and that its findings are supported by substantial evidence. Accordingly, we affirm the judgment on that basis and do not reach appellants' challenge regarding the jury's finding of Dunivan's individual liability.

## FACTUAL AND PROCEDURAL BACKGROUND

Mechtech Motorsports (the business) was a high-performance automotive business that specialized in off-road and street performance vehicles. Jim McFarland established the business as a sole proprietorship in 1985 and incorporated it as Mechtech Motorsports Inc. (MMI) about eight to ten years later. He was its chief executive officer; his wife, Jeanne McFarland, was its bookkeeper and corporate president.[2]

MMI listed the business for sale in late 2009 or early 2010 through Vanguard Resource Group, with Don DiSpaltro serving as the broker. Dunivan, who lived in Texas and had experience repairing and racing automobiles, offered to purchase the business for

---

[1]    We find it curious—*especially in a case involving alter ego findings*—that both Dunivan and his limited liability company would appeal the judgment when the challenged findings adversely affect *only Dunivan*.

[2]    For convenience and clarity we will refer to Jim and Jeanne McFarland by their first names and will refer to Jim and MMI collectively as the McFarland Parties.

$150,000. MMI countered at $174,500, and Dunivan accepted. Through DiSpaltro, MMI and Dunivan entered into an "Earnest Money Receipt and Offer of Purchase of Sale of Assets" (the Purchase Agreement) dated as of July 20, 2010. The Purchase Agreement identified the purchaser as "William R. Dunivan Jr. or Assignee."

MMI and Dunivan agreed to escrow instructions and opened escrow on August 23, 2010. Two days later, MMI completed its due diligence on Dunivan's financial suitability, which revealed he had excellent credit and a net worth of approximately $5 million. Dunivan provided a "Buyer's Disclosure Statement" in which he warranted that there was no reason he would not have sufficient operating capital for the business, there was no person or entity other than himself that would have an equity interest in the business, and that he would not have to borrow or obtain from other sources any of the funds he would need to purchase or operate the business. MMI was satisfied with Dunivan's financial condition and removed the suitability contingency on August 25.

That same day, MMI and Dunivan amended the Purchase Agreement to modify the payment terms, which required Dunivan to deposit $50,000 to open escrow and to deposit the remaining $124,500 into escrow prior to closing. Dunivan made the initial $50,000 escrow deposit on August 28 with a check from his personal checking account. All the parties were aware that Dunivan intended to fund the balance of the purchase price with a portion of the approximately $750,000 in proceeds he expected to receive from the sale of real estate he owned in Texas, which that state was acquiring to widen a highway.

3

Dunivan and MMI amended the escrow instructions on September 1 to reflect Dunivan's assignment to All Mechthech, LLC (the LLC), a Texas limited liability company Dunivan would form the next day.

On October 1, 2010, MMI assigned to the LLC the lease for the property on which the business operated. The lessor, The Wyne-Snow Industrial Park (the Lessor), consented to the assignment.

Because of delays in the sale of Dunivan's Texas property, the parties restructured the sale of the business from being an all-cash purchase to MMI carrying a $132,250.50 balance for 60 days. This would allow escrow to close on the sale of the business before Dunivan received his proceeds from the sale of his Texas property.

On October 29, 2010, MMI and Dunivan amended the Purchase Agreement to designate the LLC as the purchaser. Dunivan, as manager of the LLC, signed (1) a promissory note agreeing to pay $132,250.50 to MMI by December 29, 2010; and (2) a security agreement securing the promissory note. Dunivan also wrote a personal check to escrow in the amount of $4,662 to cover the business's rent payment. Escrow closed November 1, 2010.

The same day that escrow closed, the LLC attempted to register to do business in California. Due to a variety of errors, however, the LLC did not become registered until 2012. The LLC was initially unable to open bank accounts in California, so Dunivan used his personal credit card to purchase parts for the business.

Within a week after escrow closed, Dunivan began giving indications he intended to close the business. He told Jim he wanted to "unravel the deal," but Jim was unwilling

4

to.  Neither Dunivan nor the LLC made the final payment of $132,250.50 due under the Purchase Agreement and promissory note.  In late November or early December, Dunivan notified the business's employees and customers that the business would close on January 15, 2011.  It did.

In June 2011, the Lessor sued MMI, Jim, the LLC, and Dunivan for unpaid rent that began accruing after the business closed.  The McFarland Parties filed a cross-complaint against appellants asserting indemnity claims arising from the Lessor's lawsuit, contract and fraud claims arising from nonpayment of the balance of the purchase price and nonpayment of rent, and a related claim for declaratory relief.  The cross-complaint alleged the LLC was Dunivan's alter ego, and vice versa. Appellants filed their own cross-complaint against MMI, Jim, and Jeanne alleging a variety of contract and fraud claims arising from alleged misrepresentations regarding the nature and profitability of the business.  The Lessor eventually settled with appellants and dismissed its complaint.

The parties went to trial on their cross-complaints.  They tried their legal claims to a jury and the McFarlands Parties' alter ego claim to the court.  The jury returned a verdict in favor of the McFarland Parties on their contract claim, but found against them on their fraud claim.  The jury held both Dunivan and the LLC liable on the McFarlands Parties' contract claim.  The jury found against appellants on all their claims.

After the jury returned its verdict, the court, having already received all evidence during the first phase of trial, heard argument on the McFarlands Parties' alter ego

5

claim.[3]  The parties also argued the propriety of holding Dunivan individually liable for breach of contract in light of his assignment of the Purchase Agreement to the LLC.  The trial court issued a minute order ruling in favor of the McFarland Parties as follows:

> "Following completion of a jury trial, including verdict, the parties presented the Court with argument on the remaining Equitable issues.  As the jury declined to award Punitive damages, the issues left to the Court were limited.  This Court finds in favor of the McFarland parties, against the Dunivan parties on the issues of Alter Ego, and whether the jury properly considered him in breach of contract personally, as opposed to only his Assignee, All Mechtech LLC.

> "This decision is based upon the evidence which supports that Mr. Dunivan was the sole owner and decision maker of the LLC.  The agreed upon evidence that the payment by the LLC on the remaining note was always linked to the sale of Dunivan's personal real estate supports that he was closely tied to the finances which could never be timely paid without his personal involvement.  The decision to close the shop, terminate the business and stop paying on debts were all made personally by Dunivan.

> "It would be inequitable to allow Mr. Dunivan, having breached the contract for purchase, to avoid payment simply by refusing to fully fund the LLC with the anticipated (though late realized) sales proceeds of his personal property."

Appellants requested a statement of decision on the equitable issues tried to the court.  Accordingly, the court issued the following statement:

> "The Court found Plaintiff's [*sic*] to be more persuasive and credible than Mr. Dunivan.  Mr. Dunivan was the sole owner of the LLC, and made all financial decisions regarding the LLC.  Mr. Dunivan testified that he always intended his personal assets (Real Estate) to be used to fund the final purchase of the business in question.  There were no circumstances where the business itself could have made the

---

[3]    The court heard the McFarland Parties' expert testimony regarding alter ego issues during the first phase of the trial, but did so outside the presence of the jury.

final cash payment in a timely manner. The testimony of both the McFarlands and Mr. Dunivan established without reasonable dispute that Dunivan intended to close the business, return property and stop paying debts and rent.

"It would be inequitable to allow Mr. Dunivan, having breached the contract for purchase, to avoid payment simply be [*sic*] refusing t[o] fully fund the LLC with the anticipated (though late realized) sales proceeds of his personal property."

The court entered judgment in favor of the McFarland Parties and against appellants. Appellants timely appealed.

## DISCUSSION

Appellants contend the trial court erred in two ways. The first was by allowing the jury to hear and consider Dunivan's individual liability for the LLC's contractual obligations. According to appellants, the only bases for Dunivan's name to appear on the special verdict form were under an alter ego theory or on the theory that his assignment to the LLC was somehow ineffective. Appellants contend both of these theories presented questions for the trial court to resolve. The second error, according to appellants, was the trial court's conclusion that Dunivan was liable for the LLC's obligations on an alter ego basis. Appellants contend the trial court reached that conclusion by applying the wrong legal criteria.

We conclude the trial court applied the correct criteria to invoke the alter ego doctrine and that its findings are supported by substantial evidence. Because the judgment is supported on that basis, we need not address whether the trial court erred by allowing the jury to consider Dunivan's individual liability.

7

*Overview of the Alter Ego Doctrine*

"Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond*).) However, "[a] corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." (*Ibid.*) "Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners."[4] (*Ibid.*) "The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds." (*Ibid.*) "The essence of the alter ego doctrine is that justice be done." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301 (*Mesler*).)

"In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the

---

[4]    The alter ego doctrine also applies to limited liability companies. (Corp. Code, § 17703.04, subd. (b) ["A member of a limited liability company shall be subject to liability under the common law governing alter ego liability . . . under the same or similar circumstances and to the same extent as a shareholder of a corporation may be personally liable for any debt, obligation, or liability of the corporation . . . ."].)

corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone."  (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 538.)

"There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case."  (*Mesler*, *supra*, 39 Cal.3d at p. 300.)  Factors the trial court may consider include, but are not limited to, the following:  " ' "[1] [c]ommingling of funds and other assets . . . ; [2] the holding out by an individual that he is personally liable for the debts of the corporation . . . ; [3] [the] sole ownership of all of the stock in a corporation by one individual or the members of a family . . . ; [4] the failure to adequately capitalize a corporation . . . ; [5] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . . ; [6] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; [7] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability . . . ; [and] [8] the formation and use of a corporation to transfer to it the existing liability of another person or entity." ' " (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811-812 (*Zoran*), citations omitted; *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838-840 (*Associated Vendors*).)  "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied."  (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 539.)

9

Appellants assert the trial court's alter ego analysis is subject to de novo review because the trial court applied the wrong legal criteria. The McFarland Parties counter that the substantial evidence standard governs because the trial court applied the correct legal criteria and appellants are merely challenging the trial court's evidentiary findings regarding those criteria. The McFarland Parties have the better argument.

The statement of decision addresses the unity of interest that arose from Dunivan's ownership, control, and inadequate capitalization of the LLC, and concludes it would therefore be inequitable to allow Dunivan to avoid payment. This is the two-pronged test outlined in *Sonora Diamond* for determining whether the alter ego doctrine applies. (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 538.) Appellants' true challenge, then, is to the sufficiency of evidence supporting the trial court's determination that both prongs were satisfied. We review this challenge for substantial evidence. (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108.)

Under the substantial evidence standard of review, "the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Grainger v. Antoyan* (1957) 48 Cal.2d 805, 807, italics omitted.) We are required to accept all evidence that supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the judgment. (*Minelian v. Manzella* (1989) 215 Cal.App.3d 457, 463.) Thus, it is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not

disturb the judgment if there is evidence to support it. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766; see *Leff v. Gunter* (1983) 33 Cal.3d 508, 518.)

*Analysis*

Substantial evidence supports the trial court's alter ego findings. Beginning with the unity of interest between Dunivan and the LLC, the McFarland Parties' accounting expert, Richard Holstrom, testified the LLC was inadequately capitalized. (*Zoran*, *supra*, 185 Cal.App.4th at pp. 811-812.) Holstrom testified Dunivan invested approximately $68,000 in the LLC. But based on the business's expected cash flow, compared with its expected operating expenses and the known $132,250.50 balloon payment due on the purchase price within 60 days of the close of escrow, Holstrom opined the LLC should have been funded with $231,510—more than three times the amount Dunivan actually invested. The trial court interrupted appellants' argument during the equitable phase to observe that the balloon payment "was an expense that was due under the best of circumstances within 60 days after the sale, and the business was never going to cover that . . . . [¶] So [Dunivan] always had to put in under the rosiest of circumstances $110,000 more. I mean that is the place where I see that the strongest argument on [the McFarland Parties'] part on the capitalization aspect of it." We find this reasoning persuasive and conclude substantial evidence supports the finding that the LLC was inadequately capitalized.[5]

---

[5] The parties debate whether inadequate capitalization can, standing alone, justify piercing the corporate veil. We need not resolve that question because the record contains substantial evidence of the presence of additional alter ego factors. We note,

Holstrom also testified about the lack of separateness between Dunivan and the LLC from an accounting standpoint. (*Zoran*, *supra*, 185 Cal.App.4th at pp. 811-812.) Holstrom acknowledged Dunivan's investments in the LLC—made in the form of loans—were documented in a ledger, but noted the ledger did not include indicia that the loans were made at arm's length.[6] To the contrary, Holstrom characterized the interest-free loans as "atypical" in that they were made on preferential terms that a bank or uninterested party would not agree to. Holstrom also characterized as "not typical" Dunivan's use of his personal credit card to purchase parts for the business. Finally, everyone understood Dunivan intended to fund the remainder of the purchase price with a portion of the proceeds from the sale of his own real estate. Thus, from an accounting standpoint, substantial evidence supports a finding of a lack of separateness between Dunivan and the LLC.

---

however, that appellants overstate the import of *Associated Vendors*, *supra*, 210 Cal.App.2d 825. While that court stated no case has "held that this factor alone *requires* invoking" the alter ego doctrine, the case does not state that a court *may not* invoke the doctrine based on inadequate capitalization alone. (*Id*. at p. 842.) Likewise, the McFarland Parties overstate the import of *Automotriz Del Golfo De California S. A. De C. V. v. Resnick* (1957) 47 Cal.2d 792. While that court held inadequate capitalization is "[a]nother factor to be considered," it was not the *only* factor that court considered. (*Id*. at p. 798 ["the trial court was entitled to consider the failure to issue any stock or apply for permission to do so and the creation and operation of Erbel, Inc. with little or no capital, as well as all relevant facts concerning the manner in which the business was operated."].)

[6]     Holstrom testified those indicia include "a date of the transaction, how much money was lent, the terms of the payback, whether or not the interest, if any, is being charged at market rates to indicate that there's actually a separateness between the money being—between the owner and the corporation."

Substantial evidence also supports a finding of a disregard of corporate formalities. (*Zoran*, *supra*, 185 Cal.App.4th at pp. 811-812.) Dunivan assigned his role as purchaser to the LLC before the LLC ever existed. The LLC operated in California before it was registered to do so and did not obtain all required licenses and permits for the business. Additionally, the trial court received Dunivan's deposition testimony wherein he trivialized the LLC's corporate formalities.[7]

Other substantial evidence also supports the finding that there was a unity of interest between Dunivan and the LLC. Dunivan was the LLC's sole owner. (*Zoran*, *supra*, 185 Cal.App.4th at pp. 811-812.) He had already incurred the $132,250.50 liability by the time he established the LLC and he transferred that existing liability to the LLC. (*Id*. at p. 812.) In that vein, Dunivan testified in his deposition that "part of the appeal of using an LLC" was "the quality of limited liability." In light of all the foregoing, we conclude substantial evidence supports the trial court's finding that a unity of interest existed between Dunivan and the LLC.

Substantial evidence also supports the trial court's finding that it would be inequitable to allow Dunivan to avoid liability. Everyone understood Dunivan intended to fund the remainder of the purchase price with a portion of the proceeds from the sale of his own real estate. Dunivan sought to avoid that result by forming the LLC and

---

7       For example, when asked if the LLC held formal meetings beyond an initial one held on September 3, 2010, Dunivan responded: "Yeah. Every day I conduct a meeting . . . . [¶] Did I specifically write down every day what we talked about? No, because sometimes we didn't talk about much. 'Shave looks pretty good today. Yeah. You need a haircut pretty bad.' Yeah, you know, all I can say.' "

transferring his interests to it. Notably, Dunivan only did so after MMI had completed its investigation of his financial suitability—timing the broker, DiSpaltro, testified was not typical for a transaction of this type. And although DiSpaltro may have known earlier in the transaction that Dunivan "had mentioned that he had a corporation in Texas," neither DiSpaltro nor Dunivan communicated to the McFarland Parties prior to the completion of due diligence that Dunivan might assign his interests to some entity. To the contrary, Dunivan had warranted in his Buyer's Disclosure Statement that no person or entity other than himself would have an equity interest in the business. Obviously, the McFarland Parties became aware of the assignment when it occurred, but by then MMI had completed its due diligence and DiSpaltro testified he never advised the McFarland Parties of the possibility of reopening due diligence. In addition, even after the assignment, the parties understood the balance of the purchase price would still be funded by a portion of the proceeds from the sale of Dunivan's property. This evidence supports the trial court's finding that it would be inequitable to allow Dunivan to use the LLC as a shield to avoid payment.

This evidence also distinguishes this case from those involving the mere "[d]ifficulty in enforcing a judgment or collecting a debt" that do not warrant alter ego liability. (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 539.) Nor, as appellants suggest, is this a case of "holding Dunivan individually liable because he had provided start-up funding for [the LLC] with his own personal assets, as is typical of practically every small business." Rather, this is a case where Dunivan identified a specific source of

14

funds that would be used to pay the balance of the purchase price but then created a limited liability company to shield himself and those funds.

Appellants argue the trial court's finding that "[i]t would be inequitable to allow Mr. Dunivan, *having breached the contract for purchase*, to avoid payment" was influenced by the jury's improper finding that Dunivan individually breached the Purchase Agreement. (Italics added.) We are not persuaded. The statement of decision makes no reference to the jury's finding. Rather, in the context of the trial court having just concluded in the preceding paragraph of the statement of decision that there was a unity of interest between Dunivan and the LLC, we construe the reference to Dunivan "having breached the contract" as referring to Dunivan acting through the LLC. (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 896 [ambiguities in a statement of decision that are not brought to the trial court's attention will be resolved in favor of the prevailing party].)

Appellants argue that because Jim and Jeanne, themselves, used a corporation (MMI) to operate the business, they are estopped from invoking the alter ego doctrine. In support of this argument, appellants cite *Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980 (*Communist Party*) for the proposition that "persons who themselves control a corporation or who have used the corporate form of doing business for their benefit, may be estopped to deny a corporation's separate legal existence." Appellants mischaracterize *Communist Party*. The plaintiff in that case, a national political party organized as an unincorporated association—not a corporation at all—invoked the alter ego doctrine to reach assets held by two corporations the party claimed *it* "controlled, dominated and operated" such that "it was the beneficial owner of all the assets held by

15

both corporations." (*Id*. at p. 988.)  The party succeeded before the trial court, but was reversed on appeal.  The appellate court explained, the "alter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form."  (*Id*. at p. 994.)  With that purpose in mind, the appellate court explained why the doctrine did not apply:  "In this case, there is no third party; respondent claims that it *itself* is identical to the corporations.  Respondents have cited no case authority, and we have found none, in which rather than being used to reach behind the corporate form to attach liability to another individual or entity, the alter ego doctrine has been employed to establish a relationship of identity between the defendant corporation and the plaintiff itself, in order to allow the plaintiff to obtain for itself the assets of the corporation."  (*Id*. at p. 995.)  *Communist Party* is inapposite here because the McFarland Parties are precisely the type of third parties the alter ego doctrine was intended to protect.  Appellants' argument is further undermined by the fact that at least one other case they cite in their opening brief applied the alter ego doctrine in favor of a corporate plaintiff.  (See *NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 777-778 [finding substantial evidence supported finding of alter ego, but reversing on other grounds].)

In sum, substantial evidence supports the trial court's determinations that a unity of interest exists between Dunivan and the LLC and that it would be inequitable to allow Dunivan to escape liability.

16

DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

17