Filed 5/20/15  Poppin v. Cresson CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JOHN POPPIN,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GEORGE V. CRESSON,<br><br>        Defendant and Appellant. | A139918<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-10-501077) |

John Poppin provided legal services to Infill Community Partners, LP (Infill) in a bankruptcy proceeding.  George V. Cresson signed a payment guaranty for Poppin's fees as "president" of Cresson Development Company (CDC), a corporation.  At the time of the guaranty, unknown to Poppin, CDC's corporate powers had long been suspended.  When Poppin's fees went unpaid, he sued Cresson individually on the guaranty, alleging Cresson was liable as CDC's alter ego.  After a bench trial, the trial court ruled in Poppin's favor and awarded judgment against Cresson.[1]  We affirm.

## I.    BACKGROUND

Infill, a real estate investment firm, retained Poppin to represent it in a Chapter 11 bankruptcy proceeding in March 2003.  The sole general partner of Infill was Winterspring Structures LLC (Winterspring), and the managers of Winterspring were CDC and a trust controlled by Peter M. Radin, Jr.  Cresson was the president of CDC.

---

[1] Cresson represented himself in the trial court and continues to represent himself on appeal.

Poppin drafted a fee agreement, as well as an "Agreement of Winterspring, Radin and Cresson to Pay Attorneys and Experts and Consultants" in relation to Poppin's representation of Infill (Guaranty). The Guaranty called for Cresson's signature (as president of CDC on behalf of both Winterspring and CDC) and for Radin's signature. Poppin asked Cresson to personally guarantee payment of his fees (including costs), but Cresson refused and told Poppin, " '[D]on't worry about it. [CDC] is good for it.' " Poppin accepted Cresson's representation and made no personal investigation into CDC. In fact, CDC, an Oregon corporation, had been "administratively dissolved" in Oregon in 2000 for failure to file its annual report or pay its annual fee, and it was still inactive as of 2013.[2] CDC had also forfeited its right to do business in California in 2002, and those rights were still forfeited as of 2013.

Poppin testified that "[Radin] was primarily in charge of the monetary aspects of this case, and [Cresson was] in charge of the development of the land rights, the water rights, the CEQA problems and all of that." Radin negotiated the terms of the fee agreement and Guaranty, delivered the signed agreements to Poppin, and paid the retainer and subsequent legal bills on behalf of Infill (through his trust). Radin and Cresson expressed satisfaction with the quality of Poppin's legal representation. Infill, however, was unable to reorganize in the bankruptcy proceeding. Poppin was not paid after December 2007. He was granted permission by the bankruptcy court to withdraw as Infill's counsel in April 2008. The outstanding balance on Poppin's final invoice was $70,634.30, an amount still owed at the time of trial.

A. *Lawsuit*

In June 2010, Poppin sued Cresson, Radin and Infill for breach of contract.[3] In the operative third amended complaint, Poppin asserted causes of action for breach of

---

[2] CDC was formed as an Oregon corporation on October 4, 1995, administratively dissolved in Oregon on November 25, 1999, reinstated on January 5, 2000, and again administratively dissolved on November 30, 2000.

[3] Because only Cresson is party to this appeal, Poppin's claims against Radin and Infill are not discussed.

contract and "Common Counts," which included claims for open book account, account stated, and quantum meruit. Poppin alleged that Cresson was personally liable under the Guaranty as the alter ego of CDC. Under the heading, "Piercing the Corporate Veil," he alleged that CDC failed to observe corporate formalities, issue shares, hold director or shareholder meetings, or keep minutes; Cresson commingled personal assets with corporate assets; CDC was insolvent; and Cresson made several intentional and negligent misrepresentations. Specifically, it was alleged that "[e]xecution of the written guaranty by [Cresson] on behalf of [CDC] constituted a misrepresentation that [CDC] was a corporation in good standing, and had capital and other assets adequate to meet the obligation that [Cresson] was taking on in its name. [¶] . . . When [Cresson] executed the [Guaranty], . . . he knew that [CDC] had forfeited its right to do business in California and Oregon, and had been involuntarily dissolved by the State of Oregon, but failed to disclose these material matters to [Poppin]. . . . [¶] . . . [Cresson also] knew that [CDC] was insolvent and lacked assets with which to pay the obligations he was assuming on behalf of [CDC], but failed to disclose these material matters to [Poppin]. Had [Poppin] known . . . , he would never have accepted a guaranty purportedly made on behalf of [CDC], and would not have provided the services which are the subject of this Complaint."

B.    *Discovery*

Poppin conducted discovery on the alter ego issue. Records obtained from the California Secretary of State showed that Cresson identified himself as CDC's chief executive officer and agent for service of process as of 1995, 1996, and 2000. A 1996 filing identified David Cresson (Cresson's brother) as CDC's corporate secretary and Robert Kulda as its chief financial officer. Cresson listed an address on Purissima Street in Half Moon Bay for each of the officers and for the corporation. Records obtained from the Oregon Secretary of State showed that as of November 30, 2000, Cresson was identified as president and David Cresson was listed as secretary of the corporation, with both officers sharing an address on Main Street in Half Moon Bay.

3

In requests for admissions, Poppin asked Cresson to admit that CDC held no board of director or shareholder meetings, kept no minutes, issued no shares, failed to make required filings and fee or tax payments to state governments, and commingled its assets with Cresson's personal assets. Cresson denied all of the requests. Through form interrogatories, Poppin asked Cresson to explain his denials to the requests for admission. Cresson wrote that, at the time he signed the Guaranty, CDC "was not grossly undercapitalized," its liabilities did not exceed its assets, and it was able to meet the obligations it incurred; all required corporate formalities were observed; and CDC and Cresson did not commingle personal and corporate assets. He did not recall when CDC ceased doing business. The form interrogatories asked Cresson to identify persons with knowledge of facts related to the denials and documents that supported the denials. Cresson identified no such persons or documents.

Poppin asked Cresson to bring to his deposition CDC's articles of incorporation, bylaws, corporate minutes, bank account statements, financial statements, tax returns, stock records, and notices received from government agencies. Cresson brought none of these documents. He testified, "First, let me object based on the privacy of these documents. [CDC] is not a named defendant. And having said that, I don't have any of these documents. [¶] . . . [¶] . . . I'm sure most of them are quite old and date back from years and years and years ago. I don't have them, if I ever did have them." He testified that he made a diligent search of the offices he controlled and did not find any CDC documents. "I did not check any sources other than what I control." He did not ask his brother, David Cresson, where the documents were because "I didn't even recall that he was the secretary," and "[h]e may not have been the secretary by the time this business stopped doing business."

Cresson testified at the deposition that he was CDC's president at some point, but he could not recall whether he was president when CDC was first formed. He did not recall whether he ever received notices from the States of Oregon and California that CDC's corporate status was administratively dissolved or that its right to do business had been forfeited. He did not recall whether CDC paid any or all of its taxes. He did not

4

know whether CDC issued stock and did not believe he ever owned CDC stock. He did not know where CDC's financial statements were or whether they still existed. He acknowledged that the Cresson name was used in CDC because various members of his family were involved with the company. The discovery requests and responses were admitted in evidence at trial.

C.    *Motions in Limine and Bench Trial*

Poppin filed motions in limine asking the court to exclude evidence of CDC's separate existence as a discovery sanction and asking the court to rule as a matter of law that Cresson was CDC's alter ego. The court heard pretrial argument on these issues, but made no rulings until after trial. Cresson argued pretrial that the action against him should be dismissed because CDC was an indispensable party and had not been named as a defendant. The court rejected this argument.

The case, initially slated for jury trial, ultimately was tried to the court. On the alter ego issue, Cresson testified that he was president of CDC, but never served in any other office, "never [was] the responsible managing officer," and "never held a majority position."[4] He presented a printout from the Contractors State License Board showing that CDC was a licensed general contractor, Robert Kulda was the responsible managing officer of CDC, and CDC had no record of discipline.[5] "[H]aving been in business for many years, . . . [CDC] never was sued, never had a lawsuit resulting in a judgment, always paid its bills."

Cresson further testified, "[W]ith respect to the guaranty, I never should have signed that. That was a mistake to have ever signed it, given the corporate status of [CDC]. Very embarrassing. . . . It was not done in bad faith. I was not trying to trick anybody." He was "[c]ompletely unaware" at that time that CDC was not in good corporate standing. "I don't have a great explanation for it other than carelessness. But I

---

[4] The court allowed Cresson to testify in narrative form and to combine his factual testimony with his legal arguments.

[5] In his 1996 "Statement by Foreign Corporation," filed with the California Secretary of State, Cresson identified the business of CDC as "Real Estate Investments."

don't think . . . there's any other fact that would stand for the proposition that [CDC] was . . . a mere shell or instrumentality." At the time Cresson signed the Guaranty, CDC was in a position to cover the $75,000 legal bill that had been projected by Poppin in his discussions with Cresson, and in an even better position to cover half of that bill, which was its contemplated obligation. However, the total fees far exceeded the original projection.

Cresson testified that he ceased being actively involved in CDC in 2004 or early 2005. "Although I did not formally disassociate from [CDC], Robert Kulda took over [CDC]— . . . took all of its contracts and took over the banking. . . . [¶] . . . [¶] . . . I handed off that company to Robert Kulda."

In June 2005, a controversy apparently arose about Cresson's liability under the Guaranty. Cresson did not remember signing the Guaranty until he reviewed a copy of it and saw his signature on behalf of CDC. Cresson promptly informed Poppin by email (with a copy to Radin): "We need to alter the engagement letter to reflect that [CDC] is a now [a] defunct entity." Poppin replied, "How do you suggest that we change the Agreement?" Cresson did not respond. Radin replied to Cresson, "[A]lter it how . . . to add you as an individual?" Cresson responded (with a copy to Poppin): "Sorry. No can do. [I] don't have the dollars to make that kind of guarantee." Poppin did not reply to this second email, investigate the status of CDC, or take other action with respect to the Guaranty. Cresson testified, "I certainly don't believe that I did deal with him unjustly. When I had bad news to convey, I did not sugarcoat it. I was very straight." He argued Poppin could have sought to withdraw as Infill's counsel at that point, thereby limiting his fee exposure. Poppin testified that he first learned that CDC had been suspended only after he had withdrawn as counsel for Infill in 2008, and that if he had learned about the suspension earlier he would have tried to extricate himself from the case. Regarding Cresson's 2005 email, Poppin testified, "[Cresson] wrote to me in an email, 'We're broke.' Do you know how many debtors have written, 'We're broke and can't pay,' and they're lying?"

6

D.    *Closing Argument*

On the alter ego issue, Poppin argued, "There's no evidence to suggest that . . . Cresson ever conducted . . . his corporation in any way which would allow there to be a separation between individual and the corporation.  We've asked him to produce . . . separate bank accounts, some minutes, all the things that the law requires you to do to separate yourself from a corporate entity and there were none of those," even though Cresson was in a position to produce the records.  "I don't know what else we can do in terms of proof except to send interrogatories and ask to please produce the documents which show . . . validity of the corporation. [¶] . . . [¶] [W]e have to assume, since they couldn't produce them, they didn't know where they were or . . . that none exist."

Cresson responded that Poppin bore the burden of proof on the alter ego issue and "there's a factual vacuum[.] . . . [A]s long as I have discharged honestly and diligently my discovery obligations, I am not responsible for that factual vacuum."  Had discovery been propounded directly on CDC, Cresson argued, "Kulda would have come in here with all these documents, all the banking records and my brother would have found . . . the old corporate records to the extent he had them.  I don't have them.  If I had them, I would have brought them."  "I use my brother's office . . . as a mailing address. . . . [¶] . . . I'm working mainly out of a pizza-and-Kinko's."  He argued, "I have offered testimony [of CDC's separate corporate existence] and that testimony is not contradicted by any evidence.  And of the 20 factors [in *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825] . . . [¶] I think the one fact that has been offered . . . is . . . I executed a document on behalf of a defunct entity.  But I don't believe that there's any evidence to support any of the other factors."

"Even putting that aside," Poppin argued, "it is quite sufficient [to establish alter ego liability] . . . to show that the corporation was defunct and not allowed to do business long before they entered into the contract."  He expressly argued that the case turned on the fact that CDC was unable to do business in 2003 when Cresson signed the Guaranty.  He argued Cresson was "lying" in 2003.  "Cresson knew very, very well that his company was defunct.  He knew it because he controlled it.  He was the president of it."

7

Cresson maintained, "I don't believe that someone is entitled to just accept that I am the one and only authority for [CDC]. I never suggested that, and Robert Kulda was actually involved in [the Infill] project." He argued further, "[CDC] was a bit player in this guarantee. No bills went to [CDC]. When there were dunning calls, they didn't go to [CDC]. When [Poppin] learned of the disability of [CDC], contrary to his stated view that he would immediately withdraw, he didn't do that. It was years later that he withdr[e]w. His motion to withdraw had nothing to do with [CDC's] disability. [¶] . . . [H]e saw an error, a very embarrassing error on my part, in the formulation of that document and pounced on it for collection purposes. That's what people do when they are owed money. But I don't believe that . . . it was ever really relied upon to begin with. And I don't believe that it was handled in the proper way once the disability of [CDC] was learned."

Cresson further argued that once there had been a late payment or at least once he told Poppin in 2005 that CDC was defunct, Poppin should have addressed the issue and demanded a replacement guaranty or withdrawn as counsel.

E.      *Oral Statement of Decision*

The trial court rendered an oral statement of decision on the alter ego issue. "Poppin testified with no contradiction that he asked for a personal guaranty . . . for [Cresson] to sign personally. But you made it clear you were not going to sign and put yourself personally on the hook. . . . [¶] . . . [But] you said, 'My company's good for it.' . . . [W]as it reasonable for him to rely on a referred contract with a corporate president to sign on the bottom line? Yes. [¶] It's not a fraud case . . . where . . . the jury evaluates whether it was reasonable reliance and so forth. This was the negotiated deal, and . . . this is not an impermissible risk. It was a risk of saying, I'd like your personal guaranty. Answer: I'm not going to give it. Well, then how about your corporation? It's good for it. [¶] . . . Cresson said, I really had in mind that my company had at least $37,500. We could have been good for that. But somehow then, some years later when we got behind in and made it clear that my company was defunct, . . . [¶] . . . that somehow from that moment forward, . . . Poppin probably should have—well, and that's where the argument

8

breaks down, because it's not a legal argument; it's something about justice and fair play. [¶] . . . [¶] . . . Cresson, . . . as the president of the company, having elected to do business in the form of a corporation that offers substantial protections exactly of the kind you're describing, that it's a matter of the corporation maintaining the distinction between an individual and the corporate entity and causing meetings to occur and causing minutes to be prepared and to maintain a minute book, and to have share certificates and to make regular filings and pay the money to the state for the privilege of doing business. [¶] And I think the history in Oregon with two sets of suspensions and revivors and notices to you as president and the history in California of that, it makes it difficult. It tells me that, without saying anything bad, something is happening in your life but you are charged with the responsibility for keeping alert to those developments if you want the protection of the form of a corporation of doing business. [¶] And as it relates to the discovery process, well, it's my brother, this address, or it's just an office drop or things going on, I think you, as president of the corporation, were in a far superior position to quickly, efficiently scoop up a paper bag with whatever papers there were and answer questions under oath at a deposition. And it's not an obligation of . . . Poppin . . . to go through the shell of the corporation to you under these circumstances that he has to do all that.

"[T]he document from the State of California showed you were not authorized to sign the document. You call it an embarrassing mistake. It was contrary to the privilege of doing business as a corporation when you signed as guarantor and when, in addition, you told . . . Poppin undisputedly that 'I'm good for it,' and you had in mind at least [$]37,000 in the bank. For two years or three you hadn't been authorized to do business anyway. [¶] So I do find that there's ample reason in justice and in equity to disregard the corporate entity in this case."

F. *Judgment*

The court entered judgment against Cresson (and Radin) for $70,634.30 in fees and $35,317.15 in interest, for a total of $105,951.45.

9

## II.    DISCUSSION

Cresson argues the trial court's finding that he was liable as CDC's alter ego was unsupported by substantial evidence. We conclude the trial court's statement of decision cites substantial evidence supporting a finding of unity of interest between Cresson and CDC and a conclusion that recognizing the separate identity of CDC would lead to an inequitable result.[6]

A.    *Standard of Review*

"Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538.) "Whether a party is liable under an alter ego theory is normally a question of fact. [Citations.] 'The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court.' [Citation.] Nevertheless, it is generally stated that in order to prevail on an alter ego theory, the plaintiff must show that '(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected.' " (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811 (*Zoran*).)

" 'The alter ego test encompasses a host of factors: ". . . [c]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses[;] . . . the treatment by an individual of the assets of the corporation as his own[;] . . . the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities[;] . . . the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization[;] . . . the use of a corporation as a mere shell,

---

[6] Because we affirm the judgment based on a finding of alter ego liability, we need not address Poppin's argument regarding the second cause of action (common counts).

instrumentality or conduit for a single venture or the business of an individual or another corporation . . . . This long list of factors is not exhaustive.  The enumerated factors may be considered "[a]mong" others "under the particular circumstances of each case." ' [Citations.]  'No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine.' " (*Zoran, supra,* 185 Cal.App.4th at pp. 811–812; see *Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at pp. 838–840.)

We review the trial court's alter ego ruling for substantial evidence, with "all conflicts in the evidence . . . resolved in favor of the respondent, and . . . all legitimate and reasonable inferences . . . indulged in to uphold the findings of the trial court." (*Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at p. 835.) " 'Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial evidence.' " (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108.)

B.     *CDC's Direct Liability*

As a preliminary legal matter, Cresson argues on appeal that a prerequisite to imposing alter ego liability on an individual is a finding that corporation itself was liable under the contract.  He argues his signature on the Guaranty as CDC's president was insufficient alone to bind CDC, and therefore the prerequisite was not satisfied in this case.

This argument is forfeited because Cresson did not raise it in the trial court until after entry of judgment.  Cresson claims he argued during the trial "that CDC only partially executed the [Guaranty] . . . and that CDC was not bound by it."  In the passage of the reporter's transcript that Cresson cites in support of this claim, however, he testified, "I should never have even partially had [CDC] partially execute a document when its corporate status was as it was at that time.  I don't dispute that."  Cresson acknowledged his negligence in signing the Guaranty on behalf of CDC when CDC's corporate status had been suspended and argued, "I don't believe, *other than that fact—*

11

*and it's a terrible one, I admit it— . . .* there's any other fact that would stand for the proposition that [CDC] was . . . a mere shell or instrumentality." (Italics added.) Cresson was acknowledging that his execution of the Guaranty while CDC was suspended tended to *support* imposition of alter ego liability. He never argued that his sole signature on the Guaranty was insufficient to bind CDC and thus there was no corporate liability for which he could be held personally responsible. Cresson seems to fail to appreciate the irony in his argument that the Guaranty is invalid due to failure of the corporation to observe corporate formalities to ratify and approve his signature. The argument is in any event forfeited. (See *Ward v. Taggart* (1959) 51 Cal.2d 736, 742.)

C.    *Discovery Documents*

As a preliminary procedural matter, Cresson contests Poppin's reliance on Cresson's deposition testimony and responses to discovery demands (Exhibits 8 & 10).[7] Cresson raises numerous challenges to the trial court's and this court's consideration of these exhibits, none of which we find persuasive.

Cresson argues "the trial court was not entitled to rely upon and this court must disregard these trial exhibits because each of them was lodged with the trial court with the express representation by Poppin's attorney that they were being lodged with the trial court, 'not for purposes of this trial.' " This is a mischaracterization of the record. In relation to the disputed exhibits, Poppin's attorney first commented, "We offer Exhibits— not for the purposes of this trial, but just to make sure the record is clear—Exhibits 7 and 8. I think 7 I don't have in front of me. 7 are the documents that we asked you to take judicial notice of. [¶] . . . [¶] . . . And I just wanted to make sure the record was clear on that and that they were lodged with the court in their original form." The court acknowledged that it would "take judicial notice of those." Exhibit 7, which is included in the appellant's appendix, consists of the notices from Oregon and California concerning CDC's suspended status and related state records. Poppin had previously

---

[7] Cresson complains that he could not locate Exhibits 8 or 10 in respondent's appendix. Both exhibits, however, are clearly indentified in the appendix and listed in the index.

filed a request for judicial notice of those records in support of his motions in limine on the alter ego issue, and the court apparently had deferred ruling on that request. Poppin's attorney thereafter offered Exhibits 8 and 10 to "be admitted into evidence," and the court said, "They're admitted." Taken in context, the record does not support Cresson's contention that Exhibits 8 and 10 were simply subjects of judicial notice and were not received in evidence for purposes of trial.

Cresson next contends Poppin lodged Exhibits 8 and 10 with the trial court "without first showing any of them to defendants," and "at no point during the balance of the trial did Poppin show Cresson any part of these trial exhibits" or give him an opportunity to explain or respond to them. Poppin's attorney, however, expressly described the exhibits to the court as "some discovery that was involved [*sic*] to Mr. Cresson" and as "discovery documents" and expressly asked that they "be admitted into evidence." Cresson did not object. Poppin previously described and extensively quoted from the documents in his motions in limine—citing them for the same purpose pretrial as at trial and on appeal. Cresson never protested in the trial court that he had not been given an opportunity to explain his discovery responses. On the contrary, he defended his discovery responses as reasonable and argued that Poppin had failed to meet his burden of producing evidence by failing to propound discovery directly on CDC. We see no procedural unfairness or error.

Cresson next argues the exhibits were improperly admitted because they were incomplete and not properly authenticated or verified; the deposition passages were not read into the record; and the court never ruled on objections that Cresson made in his written discovery responses and during the deposition. Because Cresson did not challenge admission of the evidence on these grounds in the trial court, the arguments are forfeited. (See *Ward v. Taggart, supra,* 51 Cal.2d at p. 742.) Even though Cresson represented himself in the trial court, he is held to the same rules as a represented party. (See *McComber v. Wells* (1999) 72 Cal.App.4th 512, 522–523.)

In any event, we take into account Cresson's explanations of his discovery responses *post* when we consider whether the trial court's alter ego finding was supported

13

by substantial evidence.  We reject his arguments that the exhibits failed to support the court's ruling.

D.     *Significance of CDC's Dissolved and Forfeited Status in 2003*

Cresson argues the trial court applied the wrong legal standard in imposing alter ego liability.  He contends the court pierced the corporate veil *solely* because CDC was a suspended corporation in 2003 when Cresson signed the Guaranty on the corporation's behalf and not by applying the two-prong alter ego test described in *Zoran, supra,* 185 Cal.App.4th at page 811.[8]  Cresson cites a Ninth Circuit opinion expressing its view that California law does not impose personal liability based solely on a corporation's suspended corporate status.  (*United States v. Standard Beauty Supply Stores, Inc.* (1977) 561 F.2d 774, 776–777.)  That same opinion, however, acknowledged that a corporation's inactive status remains a relevant factor in the alter ego analysis:  "[A] corporation's failure to pay its franchise tax *may* be evidence that the shareholders do not view the corporation as having a separate existence . . . [and] this failure must be treated and weighed like any other failure to observe the normal requirements for a corporation." (*Id.* at p. 777, italics added.)

Cresson cites certain comments by the trial court in colloquy during his testimony as evidence the court expressly disclaimed any reliance on evidence that CDC failed to observe corporate formalities or on similar alter ego factors.  Even if the comments could be interpreted as Cresson suggest, he takes the remarks out of context, and we conclude that the court made clear in its oral statement of decision that it did not rely solely on CDC's delinquent status to make its alter ego finding.

E.     *Unity of Interest Between CDC and Cresson*

As noted *ante,* the first prong of the alter ego test is whether " 'there is such a unity of interest that the separate personalit[y] of the corporation[] no longer exist[s].' " (*Zoran, supra,* 185 Cal.App.4th at p. 811.)  Cresson complains that the trial court drew a

---

[8] We acknowledge that Poppin argued in the trial court that alter ego liability could be imposed simply because of the corporation's inactive status at the time Cresson signed the Guaranty.

14

negative inference from his failure to produce corporate records that would demonstrate that CDC observed corporate formalities, issued stock, held director and shareholder meetings, and was adequately capitalized. In other words, the court erred by implicitly finding that CDC failed to do those things. We find that the court was entitled to draw such inferences, and that those inferences are more than adequate to support the alter ego finding.

Essentially, Cresson argues that the court, in drawing negative inferences from his failure to produce CDC's corporate records in discovery, shifted the burden of proof on the alter ego issue and required him to prove CDC's separate corporate existence. (See *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1212 ["[i]t is the plaintiff's burden to overcome the presumption of the separate existence of the corporate entity"].) He notes that he testified in deposition that he did not *have possession* of CDC's corporate records, not that those records did not exist; and he testified that he did not *recall* whether CDC ever issued stock or paid taxes (and thus presumably had stock or tax records), not that CDC never had such records. However, the trial court ruled that Cresson, "as president of the corporation, w[as] in a far superior position to quickly, efficiently scoop up a paper bag with whatever papers there were and answer questions under oath at a deposition. And it's not an obligation of . . . Poppin . . . to go through the shell of the corporation to you under these circumstances that he has to do all that." The court was not required to accept Cresson's self-serving explanations. Documents produced from Oregon and California public records showed that Cresson was at least aware of his obligation to make public filings on behalf of the corporation, and to pay fees and taxes to keep its corporate powers intact.[9] Cresson identified himself in those filings as the corporation's president or chief executive officer. The court could reasonably view Cresson's disclaimer of knowledge as to the conduct of corporate affairs and location of relevant records as suspect at best. "If weaker and less satisfactory

---

[9] These documents also render suspect Cresson's denial of knowledge of the corporate suspensions at the time he executed the Guaranty in 2003.

15

evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." (Evid. Code, § 412; see CACI No. 203.) The trial court here was entitled to view Cresson's testimony that CDC observed all corporate formalities with distrust in light of his failure to produce *any* corporate records to demonstrate that fact. (See *Largey v. Intrastate Radiotelephone, Inc.* (1982) 136 Cal.App.3d 660, 664, 672 [Evid. Code, § 412 held to apply where company officer testified from memory about the date of a company board meeting rather than producing corporate records to establish when the meeting occurred])

Cresson notes that he was deposed as an individual, not as a representative of CDC, and that Poppin never claimed Cresson's responses were inadequate or filed a motion to compel further discovery responses from him. He cites no authority, however, for the proposition that failure to seek court intervention or sanctions is necessary before the trial court could properly draw negative inferences from the discovery responses he chose to provide.

There was substantial evidence of CDC's failure to maintain minutes or adequate corporate records, disregard of corporate formalities, and use of the corporation, since at least 2000, as a mere shell, instrumentality or conduit for Cresson's business. (*Zoran, supra,* 185 Cal.App.4th at pp. 811–812.) We conclude the trial court's finding of unity of interest and ownership was supported by substantial evidence.

F.      *Inequitable Result*

"The second requirement for application of the alter ego doctrine is a finding that the facts are such that adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice. [Citation.] The test for this requirement is that if the acts are treated as those of the corporation alone, it will produce an unjust or inequitable result." (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1073; *Zoran, supra,* 185 Cal.App.4th at p. 811 [" 'inequitable results will follow if the corporate separateness is respected' "].) "Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced . . . . The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some

16

conduct amounting to bad faith makes it inequitable . . . ." (*Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at p. 842.) Nevertheless, neither actual fraud nor wrongful intent need be shown to establish this inequitable results prong of the alter ego test. (*Claremont Press Pub. Co. v. Barksdale* (1960) 187 Cal.App.2d 813, 817; *Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811, 816.) Rather, the second prong is satisfied when the alleged alter ego seeks the benefits of the corporate form (limited liability) but shirks the corresponding burdens of the corporate form in a manner that unfairly prejudices the interests of third parties. (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300; *Aladdin Oil Corp. v. Perluss* (1964) 230 Cal.App.2d 603, 614.)

In its oral statement of decision, the trial court ruled "there's ample reason in justice and in equity to disregard the corporate entity in this case" because Cresson signed the Guaranty on behalf of CDC and expressly assured Poppin that CDC was "good for it" at a time when Cresson should have known the corporation was defunct.[10] Cresson argues his actions were not inequitable because CDC could have paid Infill's legal bills at the time the Guaranty was signed. Although Cresson testified CDC could have paid Infill's anticipated bills, the court was free to draw a contrary inference from CDC's then dissolved and forfeited status (resulting from CDC's failure to pay its tax obligations in both Oregon and California), from Cresson's inability to produce corporate records that would corroborate CDC's financial status in 2003, and from the fact that many of Infill's bills ultimately were unpaid.

Cresson further appears to fault Poppin for failure to withdraw from representation of Infill after advising Poppin in June 2005 that CDC was defunct. Cresson fails to

---

[10] Cresson faults the court for misquoting Poppin's testimony on this point. Poppin testified that, when Cresson refused to sign the Guaranty in his individual capacity, he told Poppin, " 'But don't worry about it. [CDC] is good for it.' " The court quoted Cresson's statement as " 'My company's good for it.' " The court, however, did not rely on Cresson's alleged representation that CDC was *his* company to find an inequitable result; rather, it relied on Cresson's representation that CDC was *good for it*. The misquotation, therefore, is immaterial.

17

explain how his notice to Poppin would void the obligations of the previously executed Guaranty, or how Poppin could ethically seek to withdraw from representing his client at a time when his bills were still being paid. To the extent Cresson contends that Poppin's equitable position was compromised by not abandoning his client, we disagree.

Cresson notes that the trial court stated, "It's not a fraud case." However, as noted *ante*, actual fraud need not be proven to establish an inequitable result. The court's point was that Poppin was not required to prove that he justifiably relied on Cresson's statement in order to obtain the relief he sought in the case. The court found that Poppin's reliance on the representation of CDC's president (Cresson) that CDC was "good for" the Guaranty was reasonable in the alter ego context in the sense that, under the circumstances, it would be inequitable to not pierce the corporate veil and thereby deny Poppin recovery. The trial court's inequitable result finding is supported by substantial evidence.

G.     *Conclusion*

In sum, we find no error in the imposition of alter ego liability on Cresson. " 'As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted. When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.' " (*Mesler v. Bragg Management Co., supra,* 39 Cal.3d at p. 300.) " 'Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges.' " (*Shapoff v. Scull* (1990) 222 Cal.App.3d 1457, 1470, disapproved on another ground by *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 521, fn. 10.)

### III.     DISPOSITION

The judgment is affirmed. Poppin shall recover his costs on appeal.

18

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

SIMONS, J.