Filed 1/22/25  Optiflex Properties and Development v. Duh CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| OPTIFLEX PROPERTIES AND DEVELOPMENT, LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RURNG LARN DUH et al.,<br><br>    Defendants and Appellants. | D084670<br><br><br>(Super. Ct. No. PSC1804914) |

APPEAL from a judgment of the Superior Court of Riverside County, Kira L. Klatchko, Judge.  Affirmed.

Law Offices of Roger C. Hsu, Roger C. Hsu and Gurgen Sargsyan, for Appellants Rurng Larn Duh, Samuel Chiang, and Shyh Haw Wu.

Daniel King for Appellants Lorraine's Investment LLC, AT Financial LLC, and Archiwest Investment LLC.

Lew Law Firm and Bill W. Lew for Respondent.

Defendants Rurng Larn Duh, Samuel Chiang, and Shyh Haw Wu (individual defendants) and Lorraine's Investment LLC, AT Financial LLC, and Archiwest Investment LLC (company defendants) appeal a judgment entered after a three-phase trial on plaintiff Optiflex Properties and

Development, LLC's (Optiflex) claims against them for intentional misrepresentation, concealment, and fraudulent transfer. The jury found the company defendants liable for fraudulent transfer and awarded Optiflex compensatory damages in the amount of $3.3 million and punitive damages in the following amounts: $200,000.00 against Lorraine's Investment; $50,000.00 against AT Financial; and $25,000.00 against Archiwest Investment. The trial court then conducted a bench trial and found the individual defendants jointly and severally liable with Midas California LLC (Midas) and the company defendants for the judgment under an alter ego theory.

Defendants contend on appeal that the trial court erred in imposing alter ego liability, and the individual defendants further contend that both damages awards were excessive and must be reversed. We conclude that substantial evidence supported the trial court's alter ego findings, and the defendants are precluded from challenging the amount of the damages awards on appeal because they failed to move for a new trial. We therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prior Lawsuit*

In 2008, Bill Novodor formed and was the sole managing member of two limited liability companies (LLCs), Classic Opportunity Group, LLC (Classic) and Optiflex. Optiflex's business purpose was to develop and operate medical facilities that provided both medical and mental health services. Novodor had the idea to build a skilled nursing facility in Riverside County that would dedicate 51 percent of its beds to medical patients and 49 percent of its beds to patients needing inpatient mental health services, to be paid for in part by Medicare. Medicare does not usually pay for inpatient

2

mental health treatment, but because 51 percent of the facility would be serving medical patients, Medicare would pay for part of the care provided to the mental health patients, which the Riverside County government would otherwise be obligated to pay for in full. The cost of building the proposed facility (the Project) was approximately $33 million.

Novodor identified a piece of real property in Indio, California for the Project that was uniquely valuable in that it was within walking distance of a major hospital and doctors' offices (the Property). In 2009, Classic entered escrow to purchase the Property for $2.25 million, paying a $50,000.00 deposit to open the escrow. Classic later transferred its right to purchase the land to Optiflex. Novodor and Optiflex expended much time and money related to the Project over the next several years, including by hiring architects, paying engineering costs, paying to keep the option open on the Property, entering contracts with Riverside County, and obtaining various permits and approvals.

In 2013, Novodor met with individuals he believed were the principals of a company called New Age Regional Center, LLC (New Age)—Lorraine Duh, Samuel Chiang, and Jack Wu—to discuss the prospect of New Age investing in the Project. These individuals advised Novodor that they were the owners of New Age, though they were not. Rather, each owned an LLC, and their three LLCs were the principals of New Age. Novodor did not learn this until after the contract between the parties was signed. At that time, Novodor had invested about $2.5 million of his own money into the Project. If completed, the Project would have been valued at upwards of $62 million, a figure provided by a third party that did an evaluation of the Project.

Novodor and the individual defendants had several meetings regarding the Project and ultimately signed a partnership agreement between Optiflex

3

and New Age in July 2013. Under the agreement, Optiflex and New Age would each own 50 percent of a new company they would form, called Indio Medical Village, which would own the Property. New Age was required to provide a capital contribution of $2 million, whereas the agreement did not require Optiflex to contribute any money. Instead, its prior expenditures, the architectural and engineering plans it owned, the option for the Property it held, the contracts and approvals from governmental entities it obtained, and its existing relationships constituted its capital contribution to the partnership.

New Age failed to comply with its obligation to contribute $2 million to the partnership. It made payments totaling $626,908.00 over the life of the agreement, leaving $1,373,092.00 of the $2 million unpaid.

In October 2013, New Age appears to have concluded it did not need Novodor anymore and that it would be financially advantageous to proceed without him. There was additional evidence that New Age began trying to cut Optiflex out of the Project as early as September 2013.

In mid-October 2013, New Age advised Optiflex it was bringing in a new investor to help purchase the Property, and Optiflex needed to reduce its interest in the partnership to make a percentage of the equity interest available to the new investor. Later that month, Chiang demanded that Novodor meet him to sign some documents regarding the new investor, stating that if he did not do so, the Project would never be developed. At the meeting, Chiang pointed to someone he claimed was the new investor, but he prevented Novodor from speaking with him. Chiang handed Novodor a document titled "First Amendment to the Agreement of Limited Partnership of Indio Medical Village, LLC" and demanded that he sign it on the spot. The document provided that Optiflex's partnership interest would be reduced to

4

25 percent and New Age's would increase from 50 percent to 70 percent, with 5 percent being assigned to a nonprofit. Novodor signed the document under pressure because he believed he had no other choice. In reality, there was no new investor.

Later that month, Novodor discovered that New Age had purchased the Property in its own name, though New Age attempted to conceal this fact from him. Around that same time, Novodor received multiple calls from people telling him that Chiang of New Age was representing that Novodor and Optiflex were no longer in charge of the Project and that Chiang was taking over. Optiflex and Novodor told New Age that it was required under their agreement to transfer the Property to the partnership, but they ignored the request.

In 2014, Optiflex filed a lawsuit against New Age for breach of contract, fraud and deceit, and breach of fiduciary duty. After a bench trial in 2017, the trial court found New Age liable to Optiflex on all three claims. A judgment was entered in favor of Optiflex for $2,313,717.00. The court also awarded Optiflex attorneys' fees and costs in the amount of $267,254.31.

During trial, Optiflex learned that New Age had sold the Property to a company called Midas and thus no longer owned it. As of May 2022, New Age had not paid any part of the judgment against it to Optiflex.

B. *Current Litigation*

In 2018, Optiflex filed the instant lawsuit, suing the individual defendants for intentional misrepresentation and concealment and all defendants for fraudulent transfer. Optiflex contended that New Age fraudulently transferred the Property to Midas to avoid paying any judgment that might be issued against it in the prior lawsuit. This case went to trial in 2022.

Duh testified that New Age was formed in 2013. The owners of New Age are: Lorraine's Investment, which is wholly owned by Duh; AT Financial, which is wholly owned by Chiang; and Archiwest Investment, which is wholly owned by Wu. At all times, including when New Age sold the Property to Midas, each LLC owned one-third of New Age.

Optiflex filed its lawsuit against New Age in February 2014. Midas was formed in April 2014. From 2014 until at least August 2015, the owners and members of Midas were the same as the owners of New Age: Lorraine's Investment; AT Financial; and Archiwest Investment. Each LLC owned one-third of Midas.

After Midas was formed, New Age sold the Property to Midas for $2,026,644.00. The deed transferring the Property was signed by Duh on behalf of her company Lorraine's Investment, Chiang on behalf of his company AT Financial, and Wu on behalf of his company Archiwest Investment in August 2015. The deed was recorded in June 2016.

At some point after the property transfer but before the recording of the deed, another company called A&J Investments LLC obtained an interest in Midas. The current ownership of Midas is: A&J Investment owns 45 percent; Lorraine's Investment owns 40.2 percent; AT Financial owns 10 percent; and

6

Archiwest Investment owns slightly less than five percent. Duh, Chiang, and Wu have always been the only managers of Midas.

The individual defendants denied that the purpose of transferring the Property from New Age to Midas was to avoid paying the judgment owed to Optiflex. When Chiang was previously asked the same question at his deposition, however, he stated: "I refuse to answer that." At trial, Wu testified that he, Duh, and Chiang agreed that New Age would sell the Property to Midas because they did not want New Age to own any property. Duh testified that after they transferred the land from New Age to Midas, New Age had no money to pay Optiflex, and New Age owned no property on which Optiflex could foreclose to recover on its judgment.

After six days of trial, the jury returned a special verdict in favor of the individual defendants on the intentional misrepresentation claim and the fraudulent transfer claim. It found in favor of Optiflex on its concealment claim against the individual defendants but awarded no damages. It further found in favor of Optiflex on its fraudulent transfer claims against Midas and the company defendants. The jury assessed compensatory damages against them, jointly and severally, in the amount of $3.3 million.

During the second phase of the jury trial, the jury returned a special verdict awarding Optiflex punitive damages against Midas and the company defendants in the following amounts: $500,000.00 against Midas; $200,000.00 against Lorraine's Investment; $50,000.00 against AT Financial; and $25,000.00 against Archiwest Investment.

The third phase of trial was a bench trial on the issue of alter ego liability. After the bench trial, the trial court made the following findings: "And on the alter ego, the Court finds all of the factors under *Associated Vendors* [*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d

7

825 (*Associated Vendors*)] and many different alter ego-related cases to be satisfied here with respect to the individuals being the alter egos of their entities. So Samuel Chiang, Lorraine Duh, and Jack Wu are the alter ego of their respective entities; AT Financial, Archiwest, and Lorraine's. There was overwhelming evidence at the trial to support that. . . . [I]t was overwhelming that those entities were formulated really just as shells, with no other purpose than to limit the liability of the individuals, and the individuals were controlling those. They had no assets, meaningful assets, other than the property that was acquired by fraudulent transfer which is the subject of the underlying action here. [¶] They sought to avoid the judgment in Los Angeles. The individuals did that knowing full well what they were doing and specifically with the intent to harm the Plaintiff and prevent collection efforts. Justice, among other things, absolutely requires that they be found to be the alter ego of their entity. [¶] There was also overwhelming testimony at the trial that the individual entities served no purpose other than to wrongfully receive property and to take actions in this case. The testimony specifically of Mr. Chiang demonstrated that he didn't really even understand what the entity was for, other than for that purpose. None of the entities had any other function or business other than in relation to this case. [¶] And the evidence was also that on at least one occasion and maybe on other occasions, the individuals signed transfer documents on their own behalf, not even using the entities. There was no evidence put forward that these entities observed any corporate formalities. In fact, the evidence was to the contrary. [¶] And the Court finds that the entities are the alter ego of Midas. There's no basis for the Court to find otherwise. There was no evidence submitted to the contrary that the Court found to be remotely credible or of substantial value."

8

The trial court issued a judgment against the defendants reflecting the jury verdict and bench trial findings. As to alter ego liability, the judgment stated: "Based on overwhelming evidence, Lorraine's Investment, LLC is found to be the alter ego of Rurng Lam Duh aka Lorraine Duh (or vice versa), AT Financial, LLC is found to be the alter ego of Samuel Chiang aka Samuel Shen Yuan Chiang (or vice versa), and Archiwest Investment LLC is found to be the alter ego of Shyh Haw Wu aka Jack Wu (or vice versa). [¶] . . . Based on overwhelming evidence, Midas California, LLC is found to be the alter ego of Lorraine's Investment, LLC, AT Financial, LLC, and Archiwest Investment LLC (or vice versa)." The individual defendants were therefore "severally and jointly liable for the compensatory/general damages, and severally and jointly liable for punitive damages for Midas California, LLC and for their respective LLC entities, all based on alter ego liability."

After judgment, Optiflex filed a motion to amend the judgment and reduce the punitive damages award. Defendants opposed the motion, arguing that the trial court should strike the punitive damages award altogether, and Optiflex submitted a reply. Before the trial court ruled on the motion, the parties submitted a stipulation regarding an amended judgment that reduced the punitive damages awarded to Optiflex to the following amounts to reflect 10 percent of the Property value rather than 25 percent: $200,000.00 against Midas; $80,000.00 against Lorraine's Investment; $20,000.00 against AT Financial; and $10,000.00 against Archiwest Investment. The stipulation further stated: "Defendants are not waiving their right to appeal the judgment on any and all grounds thereto, including but not limited to the argument that no punitive damages should have been awarded by the jury." The trial court entered an order reflecting the stipulated amended judgment.

9

DISCUSSION

A. *Substantial Evidence Supports the Alter Ego Liability Finding*

Defendants first contend the trial court erred in finding the individual defendants were the alter egos of the company defendants. The individual defendants argue that the court's ruling must be reversed because it contradicts the jury's finding that they were not liable for fraudulent transfer. Both sets of defendants further argue that the court's finding is not supported by substantial evidence.

1. *Standard of Review*

A determination of whether alter ego liability should be imposed "is primarily one for the trial court and is not a question of law; and [] the conclusion of the trier of fact will not be disturbed if it be supported by substantial evidence." (*Associated Vendors, supra*, 210 Cal.App.2d at p. 837; see also *Baize v. Eastridge Companies, LLC* (2006) 142 Cal.App.4th 293, 302.)

2. *Analysis*

A corporation is generally treated as a legal entity separate and distinct from its shareholders, officers, and directors, with separate and distinct liabilities and obligations. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond*).) The same is true of an LLC and its members and managers. (*Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220 (*Curci Investments*).) In certain circumstances, however, the court will disregard the corporate entity and instead regard the corporation or LLC as the alter ego of its shareholders. (*Sonora Diamond*, at p. 538.) " 'As the separate personality of the corporation [or LLC] is a statutory privilege, it must be used for legitimate business purposes and must not be perverted. When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so

10

that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 (*Mesler*); see also *Curci Investments*, at p. 221.) The alter ego doctrine thus "prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds." (*Sonora Diamond*, at p. 538.)

The individual defendants contend as an initial matter that the trial court was not permitted to impose alter ago liability after the jury found them not liable for the fraudulent transfer claim, because the court's finding cannot contradict the jury's finding. This argument demonstrates a misunderstanding of the alter ego doctrine. "An alter ego defendant has no separate primary liability to the plaintiff. Rather, plaintiff's claim against the alter ego defendant is identical with that claimed by plaintiff against the already-named defendant." (*Hennessey's Tavern, Inc. v. American Air Filter Co.* (1988) 204 Cal.App.3d 1351, 1358 (*Hennessey's Tavern*).) A claim based on the alter ego theory, "is not itself a claim for substantive relief . . . , but rather, procedural, i.e., to disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice." (*Id.* at p. 1359.)

The jury here found that the individual defendants were not liable in their individual capacities. In other words, the individual defendants had "no separate primary liability to" Optiflex. (See *Hennessey's Tavern, supra*, 204 Cal.App.3d at p. 1358.) This is not the equivalent of a finding that the individual defendants are not liable as alter egos of the entities they own.

11

(*Ibid.*)  Thus, the jury did not decide the alter ego issue, and the jury's finding that the individuals were not liable to Optiflex for fraudulent transfer did not preclude a finding that they were liable as the alter egos of their entities.

All defendants also contend that the trial court's finding of alter ego liability was not supported by substantial evidence.  We disagree.

The conditions under which the corporate entity may be regarded as an alter ego of another entity or its members vary with the facts of each case. (*Mesler, supra*, 39 Cal.3d at p. 300.)  " '[T]he doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court.' " (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811 (*Zoran*).) There are, however, two general requirements.  First, there must be such unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the individual do not in reality exist.  (*Mesler*, at p. 300.)  Second, it must be true that if the acts in question are treated as those of the corporation alone, an inequitable result will follow.  (*Ibid.*)

Factors to consider in determining whether to apply the doctrine include the commingling of funds and assets, the treatment by an individual of the assets of the corporation as their own, failure to maintain adequate corporate records, identical equitable ownership in the two entities, use of the same offices, employment of the same employees and/or attorneys, the failure to adequately capitalize the corporation or absence of corporate assets, disregard of corporate formalities, identical directors and officers, the diversion or manipulation of assets to the detriment of creditors, and the use of the corporation as a mere shell or conduit for the business of the individual or other entity.  (*Zoran, supra*, 185 Cal.App.4th at pp. 811–812; see also *Associated Vendors, supra*, 210 Cal.App.2d at p. 842; *Sonora Diamond, supra*,

12

83 Cal.App.4th at pp. 538–539.) "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." (*Sonora Diamond*, at p. 539.) Imposing alter ego liability is an extreme remedy that should be sparingly used. (*Ibid*.)

Here, ample evidence supported the imposition of this remedy. Optiflex filed its lawsuit against New Age in February 2014. Duh, Chiang, and Wu formed Midas two months later. They executed the deed transferring the Property from New Age to Midas the following year, before trial in the prior lawsuit started. They did not inform Optiflex of the property transfer.

At trial in the instant case, the individual defendants denied that the purpose of transferring the Property from New Age to Midas was to avoid paying the Optiflex judgment. When Chiang was previously asked the same question at his deposition, however, he did not deny it, but instead refused to answer. Wu testified that the individual defendants agreed that New Age would sell the Property to Midas because they did not want New Age to own any property. Duh testified that after they transferred the land from New Age to Midas, New Age had no money to pay Optiflex, and New Age owned no property on which Optiflex could foreclose to recover on its judgment. Ultimately, the jury found that the company defendants were liable for fraud for the sale of the Property from New Age to Midas.

There was identical equitable ownership in the two entities at the time of the property transfer, and each individual defendant was the sole owner and managing member of their respective LLC. (See *Associated Vendors, supra*, 210 Cal.App.2d at p. 839.) Duh was the sole owner of Lorraine's Investment, which owned one-third of New Age and one-third of Midas at the time New Age sold the Property to Midas. Chiang was the sole owner of AT Financial, which owned one-third of New Age and one-third of Midas at the

13

time New Age sold the Property to Midas. Wu was the sole owner of Archiwest, which owned one-third of New Age and one-third of Midas at the time New Age sold the Property to Midas. Duh, Chiang, and Wu were all the managing members of their respective LLCs, which in turn were the managing members of both New Age and Midas when they signed the real estate purchase contract between New Age and Midas for the sale of the Property.

The individual defendants also misrepresented the ownership of the entities at times, holding themselves out as individual owners of New Age, and each appeared to use their entity "as a mere shell." (See *Zoran, supra*, 185 Cal.App.4th at p. 811; *Associated Vendors, supra*, 210 Cal.App.2d at pp. 839–840.) When the individual defendants first met Novodor in 2013, they told him they were the principals of New Age, when in fact their respective LLCs were the true owners. The individual defendants also signed documents related to the Project in their personal capacities rather than on behalf of their entities. For example, Duh signed the Agreement of Limited Partnership of Indio Medical Village LLC in her individual capacity as a managing member of New Age, rather than on behalf of Lorraine's Investment. Chiang signed the same agreement in his individual capacity rather than on behalf of AT Financial. Wu also signed the same agreement in his individual capacity rather than on behalf of Archiwest Investment.

Some of the defendants also used the same offices, and there was no evidence that the entities observed any corporate formalities. (See *Associated Vendors, supra*, 210 Cal.App.2d at pp. 839–840.) The address of Lorraine's Investment, for example, was Duh's home address. New Age shared an address with Wu and his company Archiwest Investment. Moreover, all of

14

the defendants were represented by the same attorneys in the underlying litigation.[1]

In sum, Optiflex demonstrated the presence of several of the *Associated Vendor* factors, including the fraudulent transfer of property, the diversion or manipulation of assets between entities to the detriment of creditors, identical equitable ownership in and management of the entities, use of the entities as shells, use of the same offices among the individuals and entities, employment of the same attorneys by all of the individuals and entities, and disregard of corporate formalities. (*Associated Vendors, supra*, 210 Cal.App.2d at pp. 839–840.) This constitutes substantial evidence supporting the trial court's conclusion that the company defendants were the alter egos of Midas, and the individual defendants were the alter egos of the company defendants.

There was also substantial evidence presented to support the trial court's finding that the imposition of alter ego liability was required to " 'reach an equitable result.' " (*Mesler, supra*, 39 Cal.3d at p. 301 ["The essence of the alter ego doctrine is that justice be done."].) The jury found that the company defendants fraudulently transferred the Property to prevent Optiflex from recovering on its judgment against New Age. To

---

[1]     Although the company defendants and individual defendants retained separate counsel for this appeal, the company defendants submitted a brief arguing solely that the individual defendants should not be held liable for the judgment against the company defendants. We do not rely on this fact as it was not before the trial court, but it is consistent with the trial court's alter ego ruling because if the company defendants and individual defendants truly had distinct identities, the company defendants should be disinterested at best as to the imposition of alter ego liability on the individual defendants. If anything, it would be in the companies' financial interests to spread the liability more broadly.

15

foreclose Optiflex's ability to collect directly from the individual defendants, who were the sole owners of the company defendants and of Midas and New Age at the time of the property transfer, would be unjust. The alter ego doctrine is meant to address exactly this type of misconduct. (*Associated Vendors, supra*, 210 Cal.App.2d at p. 838 ["It should also be noted that, while the doctrine does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished."].)

Based on our review of the undisputed facts, we conclude that substantial evidence supports the trial court's findings that (1) the company defendants were alter egos of Midas, and (2) the individual defendants were alter egos of the company defendants. The individual defendants are therefore liable for the fraudulent transfer claim in their capacity as alter egos of their respective companies.

B. *Defendants Are Precluded from Challenging the Compensatory Damages Award as Excessive*

The individual defendants next contend that the jury's compensatory award was excessive and unjustified. Optiflex asserts that defendants forfeited this argument by failing to move for a new trial under Code of Civil Procedure section 657, subdivision (5), which is a prerequisite to appealing the amount of damages. We agree with Optiflex.

Code of Civil Procedure section 657, subdivision (5) provides that a trial court may vacate a verdict and grant a new trial based on a claim of excessive or inadequate damages. California courts have consistently held that the failure to move for a new trial ordinarily precludes a challenge on appeal that the damages awarded were either excessive or inadequate. (See *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 918–919 (*Schroeder*); *Hoglund v. Sierra Nevada Memorial-Miners Hospital* (2024) 102 Cal.App.5th 56, 79–80;

16

*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719 (*Jamison*); *County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1121 (*County of Los Angeles*).)  The rule is a sound one, as "[t]he power to weigh the evidence and resolve issues of credibility is vested in the trial court, not the reviewing court.  [Citation.]  Thus, a party who first challenges the damage award on appeal, without a motion for a new trial, unnecessarily burdens the appellate court with issues that can and should be resolved at the trial level.  [Citation.]  Consequently, if ascertainment of the amount of damages turns on the credibility of witnesses, conflicting evidence, or other factual questions, the award may not be challenged for inadequacy or excessiveness for the first time on appeal." (*Jamison*, at pp. 719–720; see also *County of Los Angeles*, at p. 1121.)

The individual defendants concede they did not move for a new trial before appealing the damages awards, but they imply it was sufficient that "the issue of excessive compensatory damages was brought to the Trial Court's attention" and "the issue of excessive punitive damages was also discussed" at the July 2022 hearing.  They argue that the parties' stipulation, signed by the trial court, demonstrates the intent by all that the individual defendants "could forgo any new trial motion and proceed immediately with appellate review."

We conclude that the parties' stipulation did not express an intent to relieve defendants of their obligation to file a motion for new trial as a prerequisite to claiming excessive damages on appeal.  The stipulation is silent on the subject.  We cannot infer from mere silence an intent to displace applicable law governing preservation of appellate issues.  As the Supreme Court has noted in analyzing section 657 in a related context, "California courts have consistently required strict compliance with section 657."

17

(*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 634.) "The power of the legislature in specifying procedural steps for new trials is exclusive and unlimited." (*Id.* at p. 635 [cleaned up].) And as we have explained, the trial court is in a far better position to evaluate the amount of damages awarded in light of the evidence presented at trial. (*County of Los Angeles, supra*, 112 Cal.App.4th at p. 1121.)

The individual defendants next contend that they have not forfeited their argument of excessive damages because they are challenging the jury's " 'failure to apply the proper measure of damages,' " which a party may argue on appeal without first moving for a new trial. (See *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 759 [reviewing damages award of lost profits to determine whether award was unduly speculative and uncertain as a matter of law despite appellant's failure to move for new trial].) But it is clear from the individual defendants' briefing that their argument raises factual issues not involving the measure of damages, including the actual value of the Property and whether the amount awarded by the jury was equitable under the circumstances. Their brief headings all explicitly frame their argument on appeal as a challenge to *the amount* of the award, not the proper measure of damages. And although the individual defendants claim on reply "it is undisputed that the Subject Property is only worth about 2 million dollars," they argued in their opening brief that the $2 million dollar purchase price of the property should have been reduced to $500,000.00, which one witness testified was the current value of the property. Thus, it is plain that "the award turned on a question of fact, i.e., a question to be resolved by the trial court." (*Jamison, supra*, 164 Cal.App.4th at p. 720; see also *County of Los Angeles, supra*, 112 Cal.App.4th at p. 1121.) The

18

defendants are therefore precluded from challenging the compensatory damages award because they did not move for a new trial.

C.  *Defendants Are Precluded from Challenging the Punitive Damages Award as Excessive*

The individual defendants also contend the punitive damages award was excessive, arguing that the jury erred in awarding damages based on 25 percent of Midas' and the defendant companies' net worth using the value of the Property.  Specifically, they argue that the amount of the award was improper because (1) it exceeded their ability to pay, as it was erroneously based on the value of the Property, and (2) even if the jury did properly use the property value as part of the companies' net worth, it should not have awarded damages in excess of 10 percent of that amount.  Optiflex again responds that the defendants forfeited this argument by failing to move for a new trial.  It further argues that the award is not excessive because the parties stipulated to reduce it to 10 percent of the defendant companies' net worth, which is reasonable as a matter of law.

It is true that a motion for new trial is not required as a prerequisite to an appellate argument that the plaintiff presented *no* evidence of a defendant's financial condition to support *any* punitive damages award.  (See *Adams v. Murakami* (1991) 54 Cal.3d 105, 119.)  But here Optiflex did introduce evidence of the company defendants' financial conditions.  We therefore conclude that the issue of whether the amount of the punitive damages award was too high in light of the defendants' financial conditions has been forfeited by their failure to move for a new trial.  (*Schroeder, supra*, 11 Cal.3d at pp. 918–919 [defendants forfeited claim that both compensatory and punitive damages awards were excessive by failing to move for a new trial].)  The trial court repeatedly informed defense counsel that a motion was

19

required to reduce or eliminate the punitive damages award. During phase three of the trial, the court stated: "The Court can't eliminate the punitive damages, unless you're stipulating you all want to do that, without a proper motion. And there's not been any made." The following court day, the trial court noted: "With regard to the punitives, unless you have a stipulation, I'm not sure that the Court can just reduce the – the punitives without some motion by a party, and we don't have such a motion." Later that day, the court reiterated: "I think the Court recognizes that everybody thinks that the punitives should be either reduced in some capacity or eliminated, but it's really not appropriate for the Court to take that up on its own motion at this time. So I'll leave it to you to either reach an agreement or one side bring a motion." The defendants chose not to bring a motion for new trial or otherwise move to reduce or eliminate the punitive damages award, instead stipulating to reduce the award without seeking any further reduction from the trial court. Accordingly, the defendants forfeited their claim of excessive punitive damages.[2]

---

[2]    We note that none of the defendants have argued the punitive damages award violates the constitutional limitation on excessive damages under the due process clause. (See *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 418.)

## DISPOSITION

The judgment is affirmed.  Respondent to recover its costs on appeal.

BUCHANAN, J.

WE CONCUR:

IRION, Acting P. J.

KELETY, J.